# EXHIBIT A

Joshua L. Thomas Esq.
Supreme Court ID 003992012
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
Phone: (215) 806-1733
Fax: (888) 314-8910
Email: JoshuaLThomas@gmail.com

| | |
|---|---|
| THS Group LLC<br>300 McGaw Drive<br>Edison, NJ 08837 | SUPERIOR COURT OF NEW JERSEY<br>MIDDLESEX COUNTY<br>LAW DIVISION |
| Plaintiff | |
| v. | DOCKET NO.: |
| | JURY TRIAL DEMANDED |
| Covalent Marketing LLC<br>20 W. Kinzie St., 17th FL<br>Chicago, IL 60654<br>And | |
| IBM<br>1 Orchard Road<br>Armonk, NY 10504<br>And | |
| JSL Enterprises, LLC<br>23 Burlwood Dr<br>Burlington, CT 06013-2502<br>And | |
| Acoustic, L.P.<br>100 Summit Drive<br>Suites 911 & 912<br>Burlington, MA 01803<br>And | |
| mGage: Mobile Marketing<br>470 7th Ave, 7th Floor<br>New York, NY 10018 | |
| Defendants | |

## COMPLAINT

**AND NOW** Plaintiff ( "Plaintiff"), by and through his attorney, Joshua L. Thomas, Esq. hereby move for judgment against Defendants Covalent Marketing LLC, IBM, Acoustic, L.P. and JSL Enterprises, LLC. ("Defendants"), for the reasons and amounts set forth below. In support thereof, Plaintiff aver as follows:

1.      This is a lawsuit against Defendants arising out of a failure of their product to adequately perform that has already resulted in hundreds of thousands of dollars in damages, and has put Plaintiffs at risk of substantially more, yet have failed to take responsibility for the damages.

**PARTIES**

2.      THS Group LLC is a corporation organized and existing and operating under the laws of the state of New Jersey, with a principal place of business at 300 McGaw Drive Edison, NJ 08837.

3.      Covalent Marketing LLC (Covalent) is a corporation organized and existing and operating under the laws of the state of Illinois, with a principal place of business at 20 W. Kinzie Street, 17th FL Chicago, IL 60654 but has had sufficient contacts with New Jersey to be a party.

4.      IBM is a corporation organized and existing and operating under the laws of the state of New York, with a principal place of business at 1 Orchard Road Armonk, NY 10504 but has had sufficient contacts with New Jersey to be a party.

5.      JSL Enterprises, LLC (JSL) is a corporation organized and existing and operating under the laws of the state of Connecticut, with a principal place of business at 23 Burlwood Drive Burlington, CT 06013-2502 but has had sufficient contacts with New Jersey to be a party.

6.      Acoustic, L.P. (Acoustic) is a corporation organized and existing and operating under the laws of the state of New Jersey, with a principal place of business at 100 Summit Drive Suites 911 & 912 Burlington, MA 01803 but has had sufficient contacts with New Jersey to be a party.

7.      mGage: Mobile Marketing (mGage) is a corporation organized and existing and operating under the laws of the state of New York, with a principal place of business at 470 7th Ave, 7th Floor, New York, NY 10018 but has had sufficient contacts with New Jersey to be a party.

## JURISDICTION AND VENUE

8.      Defendants have conducted and, upon information and belief, continue to conduct substantial business within the State of New Jersey on a regular basis.

9.      The incidents giving rise to this action occurred in Edison, NJ 08837.

10.     Venue is proper in Edison, NJ 08837.

11.     Venue is also proper in Middlesex County because the incidents giving rise to this action occurred in Middlesex County and/or Defendants are doing business in Middlesex County.

## FACTS

1.  Plaintiff entered into an agreement on April 1, 2019 with Defendant JSL Enterprises, LLC (JSL). (See Exhibit A – "Mutual Nondisclosure Agreement").

2.  Plaintiffs were introduced to this platform by JSL to consolidate the multiple marketing platforms into one.

-3-

3. JSL directly advised that Plaintiff move to an IBM platform, specifically the IBM Watson program which ultimately became the Platform offered by Acoustic, L.P. (Acoustic).

4. Plaintiff entered into an agreement on June 5, 2019 with Defendant Covalent Marketing LLC (Covalent). (See Exhibit B – "Software Reseller Agreement").

5. The first bill was issued by Defendant Covalent for "IBM Watson Campaign Automation Subscription and Setup" on July 15, 2019 from Covalent. (See Exhibit C – Purchase Order).

6. Covalent is a reseller of the IBM/Acoustic platform.

7. JSL was contracted to manage this platform for Plaintiff until a few months after the issue occurred that this complaint involved, at which time Plaintiff terminated their services.

8. Upon information and belief, the IBM/Acoustic platform is the platform that acts as the management portal for our Email and SMS marketing.

9. IBM/Acoustic uses a third-party service to deliver SMS messages through a short code which is done through Mgage.

10. That system that Covalent used was the IBM/Acoustic platform.

11. The IBM/Acoustic platform handles email sends and has a relationship with mGage, where mGage provides the gateway and Acoustic provides the interface for the service.

12. Implementation includes adding the email creative system using "SMS onboarding".

13. Further, a series of calls with IBM are also made, that then walk through the platform and walks through the text as part of the service, used for marketing.

14. It is a text to join platform for people to opt in and opt out.

15. Eventually, JSL and IBM were advised there was a complaint that people were responding STOP and were not being opted out.

16. JSL passed that initial complaint on to Acoustic and mGage.

17. They found that STOP was not prerecorded and was keeping the contact from fully being able to opt out, and this was the result of a "glitch".

18. The "glitch" resulted in the contacts that were sent a SMS message and replied STOP to the campaign weren't actually opted out of the campaign even though everything on Plaintiff's system was setup properly.

19. The glitch was discovered by Plaintiff and they relayed the issues to JSL via personal phone calls and text messages.

20. JSL then created an urgent support ticket with IBM to address the issue and IBM replayed that to Mgage to find the issue and resolve.

21. Once mGage was able to test that out, they were able to properly opt-out contacts.

22. Once the Stop was resolved, mGage ran a report and provided a list of the contacts who were effected.

23. JSL immediately opt-ed those numbers out or "scrubbed".

24. Further, there were apparently manual dials in violation of that scrub.

25. However, before that point, the damage was done.

26. There have been multiple settlements required, so far totaling $263,685.50. (See Exhibit D – all settlement agreements).

27. Additionally, it was learned that relatively recently, defendants were still responsible for another "glitch" and there were further violations that could result in potential liability.

28. Defendants are directly responsible for these damages and all continuing, foreseeable damage from the risk from the glitch.

29. In fact, this concern has now been actualized, with a complaint that was filed in the United States District Court for the Eastern District of Virginia. (See Exhibit E).

30. This is the **exact** concern that Plaintiffs were trying to avoid, however, because of Defendants' negligence, they are now forced to defend a new lawsuit with potentially hundreds of thousands of dollars or more of damages.

31. Plaintiff should not be liable for these damages, and should be completely indemnified for them, as they had every possible system in place to avoid the exact glitches that Defendants were responsible for.

32. Had Defendants properly handled their services they way they had agreed, there would not have been the prior cases or the current ongoing lawsuit.


### COUNT I – BREACH OF CONTRACT
**Plaintiff v. Defendants**

1. Plaintiff incorporate the allegations contained in the aforesaid paragraphs as if same were set forth fully at length herein.

2. To find a Breach of Contract under New Jersey Law:

    A. The parties entered into a contract containing certain terms.

    B. The plaintiff did what the contract required the plaintiff to do.

    C. The defendant did not do what the contract required the defendant to do.

    D. The defendant's breach, or failure to do what the contract required, caused a loss to the plaintiff.

    *Weichert Co. Realtors v. Tyan*, 128 N.J. 427, 435 (1992).

3. Further, "[a]n "installment contract" is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause "each delivery is a separate contract" or its equivalent." *NJ Rev Stat § 12A:2-612* (2013).

4. In this case, Defendant agreed to make payments each month as stated above.

5. Plaintiff complied with what they were required to do in the agreement.

6. As such, pursuant to *NJ Rev Stat § 12A:2-612*, there were numerous separate breaches, for each time the Defendants cause a glitch.

7. As such, a clear breach of contract has occurred.

8. As a result of Defendant's aforesaid action, Plaintiff is entitled to punitive damages along with the aforesaid compensatory damages, interests and costs of suit.

9. Further, Plaintiff is entitled to reasonable attorney's fees and costs. See Grow Co., Inc. v. Chokshi, 424 N.J. Super. 357, 367-68 (App. Div. 2012). *("When calculating the amount of reasonable attorney's fees, courts must determine the lodestar, defined as the "number of hours reasonably expended by the successful party's counsel in the litigation, multiplied by a reasonable hourly rate.")*

**WHEREFORE,** Plaintiff respectfully request that judgment be entered in their favor and against Defendants with respect to Count I hereof, in an amount necessary to fully compensate Plaintiff for the material breaches, including:

(i) damages to the fullest extent provided by law;

(ii) Punitive damages, to prevent repeated future conduct;

(ii) pre- and post-judgment interest and Court costs to the fullest extent permitted by law; and

(iv) such other relief as this Court may deem just and proper.

## COUNT II – BREACH OF EXPRESS WARRANTY IN VIOLATION OF N.J.S.A. § 12A:2-313
### Plaintiff v. Defendants

10.     Plaintiff incorporate the allegations contained in the aforesaid paragraphs as if same were set forth fully at length herein.

11.     To state a claim for breach of express warranty under New Jersey law, a plaintiff must allege (1) an affirmation of fact, promise, or description about the product; (2) the affirmation of fact, promise, or description became part of the basis of the bargain for the product; and (3) the product ultimately did not conform to the affirmation of fact, promise, or description. *In re Avandia Mktg. Sales Practices & Prods. Liab. Litig.*, 588 F. App'x 171, 175 (3d Cir. 2014) (citing N.J.S.A. § 12A:2-313).

12.     Moreover, New Jersey law requires that guarantees of future performance be specific. *Id.* (citing *Herbstman v. Eastman Kodak Co.*, 342 N.J. 1, 12 (N.J. 1975)).

13.     "[T]he seller need not use formal words such as 'warrant' or 'guarantee' or have a specific intention to make a warranty . . . . But that does not mean [that a plaintiff] is relieved from identifying the affirmation of fact, promise, or description he contends constitutes the express warranty under New Jersey law." *Id.* (quoting N.J.S.A. § 12A:2-313).

14.     In addition, proximate cause and damages are required. *Marcus v. BMW of N. Am.*, 687 F.3d 583, 600 n.8 (3d Cir. 2012).

15.     Finally, New Jersey has adopted the notice requirement of the Uniform Commercial Code ("UCC"), which requires statutory notice to the seller as a "condition precedent to filing any suit for breach of warranty." *Dicuio*, 2012 WL 3278917, at *11 (citation omitted).

16.     The facts above show a clear breach in this case.

**WHEREFORE**, Plaintiff respectfully request that judgment be entered in their favor and against Defendants in an amount necessary to fully compensate Plaintiff for the material breaches, including:

      (i) damages to the fullest extent provided by law;

      (ii) Punitive damages, to prevent repeated future conduct;

      (iii) Reasonable attorneys fees;

      (iv) pre- and post-judgment interest and Court costs to the fullest extent permitted by law; and

      (v) such other relief as this Court may deem just and proper.

## COUNT III – NEGLIGENCE
### Plaintiff v. Defendants

17.    Plaintiff incorporate the allegations contained in the aforesaid paragraphs as if same were set forth fully at length herein.

18.    Defendants acted negligently in taking the aforementioned actions.

19.    To establish negligence under New Jersey law, a plaintiff must prove four core elements: (1) a duty of care; (2) a breach of that duty; (3) proximate cause; and (4) actual damages. *Polzo v. County of Essex*, 960 A.2d 375, 196 N.J. 569, 584 (2008).

20.    Defendants all had a duty of care towards Plaintiffs in this matter and they breached that duty of care with the aforementioned actions.

21.    The conduct of Defendants was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, damages, and harm to Plaintiffs that are outlined more fully above and, as a result, Defendants are liable to compensate Plaintiffs for the full amount of actual, compensatory, and punitive damages, as well as other such relief, as permitted by law.

22.     Plaintiffs seek actual and compensatory damages for particular material,

economic and financial losses suffered directly by her as the proximate result of the injury.

23.     Plaintiffs must be compensated for such ill effects they experienced because of

the actual damages they've incurred.

**WHEREFORE**, Plaintiff respectfully request that judgment be entered in their favor and

against Defendants in an amount necessary to fully compensate Plaintiff for the material

breaches, including:

> (i) damages to the fullest extent provided by law;
>
> (ii) Punitive damages, to prevent repeated future conduct;
>
> (iii) Reasonable attorneys fees;
>
> (iv) pre- and post-judgment interest and Court costs to the fullest extent permitted by law; and
>
> (v) such other relief as this Court may deem just and proper.

## COUNT IV – INDEMNITY
### Plaintiff v. Defendants

24.     Plaintiff incorporate the allegations contained in the aforesaid paragraphs as if

same were set forth fully at length herein.

25.     Indemnity provisions are construed in accordance with the general rules for

construction of contracts with one important caveat: ambiguities are strictly construed against the

indemnitee. Mantilla v. NC Mall Assocs., 167 N.J. 262, 272 (2001).

26.     In keeping with that principle, "a contract will not be construed to indemnify the

indemnitee against losses resulting from its own negligence unless such an intention is expressed

in unequivocal terms." Ramos v. Browning Ferris Indus. of S. Jersey, Inc., 103 N.J. 177, 191

(1986).

27.     Where an indemnitee is partially but not solely at fault, as here, public policy does not preclude indemnification. Leitao v. Damon G. Douglas Co., 301 N.J. Super. 187, 192 (App. Div. 1997) ("Even in the context of an indemnity agreement in a construction contract, it is not against public policy for the indemnitor to promise to hold harmless the indemnitee for the indemnitee's own negligence as long as the indemnitee is not solely at fault.").

28.     As such, based on the above facts, Plaintiff should be completely indemnified because of Defendants' actions.

**WHEREFORE,** Plaintiff respectfully request that judgment be entered in their favor and against Defendants in an amount necessary to fully compensate Plaintiff for the material breaches, including:

(i) damages to the fullest extent provided by law;

(ii) Punitive damages, to prevent repeated future conduct;

(iii) Reasonable attorneys fees;

(iv) pre- and post-judgment interest and Court costs to the fullest extent permitted by law; and

(v) such other relief as this Court may deem just and proper.

### COUNT V – RESPONDEAT SUPERIOR
### Plaintiff v. Defendants

29.     Plaintiff incorporate the allegations contained in the aforesaid paragraphs as if same were set forth fully at length herein.

30.     At all material times hereto IBM, owned and directed and was responsible for all actions taken by the other Defendants.

31.     The established doctrine of Respondeat Superior provides that an employer is obligated to persons harmed by employees acting in the course of their employment.

32.     The "essence" of vicarious liability on the basis of respondeat superior is control.
Galvao v. G.R. Robert Constr. Co., 179 N.J. 462, 467 (2004) (internal quotations omitted).

33.     Underlying the doctrine is the principle that an employer who exercises control
over an employee in the performance of his duties, "must answer for any injury that a third
person may sustain from it." Carter v. Reynolds, 175 N.J. 402, 408 (2003). Vicarious liability "'is
a rule of policy, a deliberate allocation of risk.'" Carter v. Reynolds, 345 N.J. Super. 67, 75 (App.
Div. 2001) (quoting Hinman v. Westinghouse Elec. Co., 88 Cal. Rptr. 188, 190 (Cal. 1970)),
aff'd, 175 N.J. 402 (2003).

34.     Restatement 228(1) describes four factors that support a finding that an
employee's act is within the scope of her employment: (1) the act is of a kind the employee is
hired to perform, (2) the act occurs within authorized time and space limits, (3) the act is
actuated at least in part by a purpose to serve the employer, and (4) if force is intentionally used
it is not unexpectable.

35.     In this case, the above facts and court pleadings show all four factors have been
met.

36.     As to the first, IBM specifically had control and ownership over the Defendants
and the system they used; in addition to the aforementioned facts, and have already admitted as
much.

37.     As to the second, Defendants apparently only used the system that they got from
IBM.

38.     As to the third, the purported purpose was to offer services, but because of the
"glitch" which was, foreseeable, those services caused substantial damage.

-12-

39.     As to the fourth, it is entirely not unexpectable these actions would have resulted in the damages and as such, the employer(s) should be held responsible.

40.     As can be seen, there is a strong case for Respondeat Superior and as such, the employer(s) should be held responsible.

**WHEREFORE,** Plaintiff respectfully request that judgment be entered in their favor and against Defendants in an amount necessary to fully compensate Plaintiff for the material breaches, including:

(i) damages to the fullest extent provided by law;

(ii) Punitive damages, to prevent repeated future conduct;

(iii) Reasonable attorneys fees;

(iv) pre- and post-judgment interest and Court costs to the fullest extent permitted by law; and

(v) such other relief as this Court may deem just and proper.

## COUNT VI – VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT (CFA), N.J.S.A. 56:8-2
### Plaintiff v. Defendants

41.     Plaintiff incorporate the allegations contained in the aforesaid paragraphs as if same were set forth fully at length herein.

42.     The Defendant has used or caused to be employed by other persons unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and knowingly concealed, suppressed, and omitted material facts with intent that the Plaintiff rely upon such concealment, suppression or omission.

43.     The Plaintiff avers the unfair, deceptive, and unlawful practices by the Defendant misled and deceived Plaintiff, resulting in damages thereby, constituting unlawful practices in

-13-

violation of N.J.S.A. 56:8-2, and has caused injury to Plaintiff as contemplated by N.J.S.A. 56:8-19 in actual damages of emotional distress, loss of monies paid towards a *fraud in factum*, and other costs to defend the Plaintiff.

44.     At all times relevant and material hereto, then the Plaintiff was a consumer of the Defendant goods and services and as such the conduct of the Defendant and the transaction was governed by the New Jersey Consumer Fraud Act N.J.S.A. 56:8-1 et seq.

45.     At all times relevant and material hereto the Defendant did violate the New Jersey Consumer Fraud Act by engaging in deceptive and fraudulent practices as stated above.

46.     The aforementioned actions were a violation of The False Claims Act 31 U.S.C. §§ 3729 - 3733, as in case *Gonzalez v. Wilshire Credit Corp.*, Supreme Court of New Jersey, August 29, 2011.

47.     In *Cox v. Sears Roebuck*, September 15, 1994 138 N.J. 2 A-123 September term 1993." the NJ Supreme Court held: "The amendment to the Consumer Fraud Act, *N.J. Stat. Ann. §§ 56:8-1* to 20, provides for private causes of action, with an award of treble damages, attorneys' fees, and costs."

48.     Upon "strict scrutiny" application, the Court would be compelled to protect Plaintiff against blatant fraud being perpetrated upon Defendant as well as the Court under the "color of law".

49.     To do otherwise would be a travesty of justice.

50.     "Like most remedial legislation, the Consumer Fraud Act, *N.J. Stat. Ann. §§ 56:8-1* to 20, should be construed liberally in favor of consumers."

51.     The actions of the Defendants were performed for their own financial self-interests, in detriment to the rights and position of the Plaintiff.

WHEREFORE, Plaintiff respectfully request that judgment be entered in their favor and against Defendants in an amount necessary to fully compensate Plaintiff for the material breaches, including:

(i) damages to the fullest extent provided by law;

(ii) Punitive damages, to prevent repeated future conduct;

(iii) Reasonable attorneys fees;

(iv) pre- and post-judgment interest and Court costs to the fullest extent permitted by law; and

(v) such other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

A jury trial is demanded on all claims so triable.

Respectfully submitted,

Dated: 09/10/2020

_____/s/ Joshua L. Thomas_____
Joshua L. Thomas, Esq.

# EXHIBIT A

# EXHIBIT B

# EXHIBIT C

# EXHIBIT D

# EXHIBIT E

# EXHIBIT A



## MUTUAL NONDISCLOSURE AGREEMENT

This Mutual Nondisclosure Agreement ("*Agreement*") is made and entered into as of April 1, 2019 by and between

**JSL Enterprises, LLC and THS Group, LLC**

1. <u>Purpose</u>. The parties wish to explore a business opportunity of mutual interest and in connection with this opportunity, each party may disclose to the other certain confidential technical and business in formation that the disclosing party desires the receiving party to treat as confidential.

2. <u>Confidential Information</u>. "*Confidential Information*" means any information disclosed by a party's representatives (including directors, officers, employees, contractors, and professional advisers of the party, its parent company, its subsidiaries, and their affiliated companies) to the other party's representatives, directly or indirectly, in writing, orally, or by inspection of tangible objects (including documents, prototypes, samples, plant, and equipment), that is designated as "Confidential," "Proprietary," or some similar designation or that, due to its nature or the circumstances under which it is disclosed to a party's representatives, ought to be treated as confidential . Confidential Information will include the items set forth in any Appendix attached to this Agreement, whether or not appropriately designated upon disclosure. Information communicated orally will be considered Confidential Information if the information is confirmed in writing as being Confidential Information within a reasonable time after the initial disclosure or if, due to the nature or the circumstances under which such information is communicated, ought to be treated as confidential. Confidential Information may also include information disclosed to the disclosing party by third parties, including its affiliates. Confidential Information will not, however, include any information that the receiving party can document to the reasonable satisfaction of the disclosing party (i) was publicly known and made generally available in the public domain prior to the time of disclosure by the disclosing party; (ii) was publicly known and made generally available after disclosure by the disclosing party to the receiving party through no action or inaction of the receiving party; (iii) was already in the possession of the receiving party at the time of disclosure by the disclosing party; (iv) was obtained by the receiving party from a third party with out a breach of the third party's obligations of confidentiality; or (v) was independently developed by the receiving party without use of or reference to the disclosing party's Confidential Information .

3. <u>Non-use and Nondisclosure</u>. Each party will not use the other party's Confidential Information for any purpose except to evaluate and engage in discussions concerning a potential business relationship between the parties. Each party will not disclose the other party's Confidential Information to third parties or to such party's representatives, except to its parent company, its subsidiaries, and their affiliated companies and those representatives of the receiving party who are required to have the information in order to evaluate or engage in discussions concerning the contemplated business relationship. A party may disclose the other party's Confidential Information if required by law so long as the receiving party gives the disclosing party prompt written notice of the requirement prior to he disclosure and assistance in obtaining an order protecting the information from public disclosure. Neither party will reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects that embody the other party's Confidential Information and that are provided to the party in accordance with this Agreement.

4. <u>Maintenance of Confidentiality</u>. Each party will take reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the other party's Confidential Information, including the Confidential Information of each party's parent company, its subsidiaries, and their affiliated companies. Without limiting the foregoing, each party will take at least those measures that it takes to protect its own most highly confidential information and, prior to any disclosure of the other party's Confidential Information to its representatives, will have the representatives sign an non-use and nondisclosure agreement that is substantially similar in content to this Agreement. Neither party will make any copies of the other party's Confidential Information unless approved in writing by the other party. Each party will reproduce the other party's proprietary rights notices, and those of the other party's parent company, its subsidiaries, and their affiliated companies, on any approved copies.

5. <u>No Obligation</u>. Nothing in this Agreement will obligate either party to proceed with any transaction between them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement.

6. <u>No Warranty</u>. ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS." NEITHER PARTY, THEIR PARENT COMPANIES, THEIR SUBSIDIARIES, NOR ANY OF THEIR AFFILIATED COMPANIES MAKES ANY WARRANTIES, EXPRESS, IMPLIED, OR OTHERWISE, REGARDING THE ACCURACY, COMPLETENESS, OR PERFORMANCE OF ANY CONFIDENTIAL INFORMATION.

7. <u>Return of Materials</u>. All documents and other tangible objects containing or representing Confidential Information and all copies of them will be and remain the property of the disclosing party. Upon the disclosing party's request, the receiving party will promptly deliver to the disclosing party all Confidential Information, without retaining any copies.

8. <u>No License</u>. Nothing in this Agreement is intended to grant any rights to either party under any patent, copyright, or other intellectual property right of the other party, nor will this Agreement grant any party any rights in or to the Confidential Information of the other party, except as expressly set forth in this Agreement.

9. <u>Term</u>. The obligations of each receiving party under this Agreement will survive until all Confidential Information of the other party becomes publicly known and made generally available through no action or inaction of the receiving party.

10. <u>Indemnification</u>. The receiving party shall indemnify, defend, and hold the disclosing party, its parent company, its subsidiaries, and their affiliated companies harmless from and against any and all damages, claims, losses, liabilities, judgments, costs, and expenses (including without limitation attorneys' and other professional fees) resulting from or attributable to violation of any agreement, acknowledgement or under taking set forth herein.

11. <u>Remedies</u>. Each party acknowledges that any violation or threatened violation of this Agreement may cause irreparable injury to the other party, entitling the other party to seek injunctive relief in addition to all legal remedies.

12. <u>Miscellaneous</u>. This Agreement will bind and inure to the benefit of the parties and their successors and assigns. This Agreement will be governed by the laws of the State of Georgia, without reference to conflict of laws principles. This document contains the entire agreement between the parties with respect to the subject matter of this Agreement. Neither party will have any obligation, express or implied by law, with respect to trade secret or proprietary information of the other party except as set forth in this Agreement. Any failure to enforce any provision of this Agreement will not constitute a waiver of that provision or of any other provision. This Agreement may not be amended, nor any obligation waived, except by a writing signed by both parties. This Agreement may be executed in two or more counterparts, each of which is deemed to be an original, but all of which constitute the same agreement. Facsimile copies of signatures to this Agreement shall be binding originals.


**JSL Enterprises, LLC**                                        **THS Group, LLC**


By: _____             By: _____


Name: Evan Lazarus                                        Name:    David Seruya



a growth and expansion agency for small business

THS Group, LLC

**Statement of Work**

Tel: 904.800.9887   |   info@therealjsl.com   |   TheRealJSL.com



a growth and expansion agency for small business

## Statement of Work

### Dated: April 2, 2019

| Project Number | Project Name |
|---|---|
| THS – 040219 | THS Email |

**DETAILED DESCRIPTION OF ROLE (Full description of work to be performed):**

JSL. will provide:

16 monthly flexible email consultant hours that can be used towards, but not limited to, the following:

- Current state audit
- Email Infrastructure optimization recommendations
- Creative development of emails
- Testing & deployment of emails
- Monthly reporting & optimization insights
- Assist with development of email strategy

Any work performed past the 16 hour limit on this SOW will be billed at the hourly rate of $150/hour.

The term of this SOW is monthly, beginning May 1, 2019. All 16 hours must be used within the month and do not roll-over past the end of the month.

COMPENSATION

METHOD: [*check one*]

☐ Time and Materials Basis.
☒ Fixed-Price Basis.
☐ Other Basis.

TOTAL COSTS:
$2,500 per month paid in advance upon receipt of invoice.

Tel: 904.800.9887   |   info@therealjsl.com   |   TheRealJSL.com



a growth and expansion agency for small business

**Process To Include Input From All Program Areas**

Upon being awarded the project, JSL. and CLIENT will conduct a kickoff meeting via conference call, with all relevant parties, to discuss goals, KPIs, and timelines which will define the work to be performed during the contract term.

Each member of the teams (CLIENT & JSL.) will be provided with logins to the Project Management software, which is connected to their current, active email address. A timeline is established, goals & milestones are set, and each member of the team is kept informed of the current status of the project at all times. A weekly status call is set to discuss project status, revisions, and/or new items. All communication will be documented in a conference report.

**Terms and Conditions**

Client to supply all copy and images. Project cost listed above does not include the cost of any rights managed images that need to be purchased. All image purchases will be cleared with client before being made.

JSL. will not be held responsible or liable due to delays caused by 3rd party vendors. JSL. will take all steps to work proactively will all 3rd party vendors.

Client is responsible for any additional costs associated with 3rd party vendors for example, but not limited to, trackable countdown timers, trackable animation, list cleansing services and advanced analytics.

Client is responsible for procuring hosting, SSL security certificates, payment gateways and cost of images.

Client assets and project assets may be stored on a 3rd party project management system. In such cases client will be provided a custom login. Client communication, proofs, and various other files related to the project will be stored on the 3rd party project management system and will be accessible by client. JSL, takes the utmost care in providing a safe and secure storage environment, but can not be held responsible for any loss, theft or damage to files due to circumstances beyond our control.



a growth and expansion agency for small business

OWNERSHIP OF ARTWORK

Until full payment has been made, JSL. retains ownership of all original artwork created by JSL. or parts contained therein, whether preliminary or final.  Upon full payment, the client shall obtain ownership of the final artwork to use and distribute as they see fit.  JSL. retains the right to use the completed project and any preliminary designs for the purpose of design competitions, future publications on design, educational purposes, marketing materials, and portfolio.  Where applicable the client will be given any necessary credit for usage of the project elements.

DELIVERY OF PROJECT

The client will assume any shipping or insurance costs related to the project.  Any alteration or deviation from the above specifications involving extra costs will be executed only upon approval with the client.  JSL. shall not incur any liability or penalty for delays in the completion of the project due to actions or negligence of client, unusual transportation delays, unforeseen illness, or external forces beyond the control of the designer.  If such event(s) occur, it shall entitle the designer to extend the completion/delivery date, by the time equivalent to the period of such delay.

THIRD PARTY SHIPPING

In the event any material necessary for the production of the project must be shipped to a third party for additional processing, typesetting, photographic work, color separation, presswork, or binding, the designer will incur no liability for losses incurred in transit, or due to the delay of the shipper of the third party.

CLAIMS PERIOD

Claims for defects, damages, and/or shortages must be made by the client in writing within a period of fifteen (15) days after delivery of all or any part of the order. Failure to make such claim within the stated period shall constitute CLIENT irrevocable acceptance and an admission that they fully comply with terms, conditions, and specifications.



a growth and expansion agency for small business

## PROOFING OF FINAL PROJECT

JSL. shall make every effort to ensure the final product is free of any grammatical and spelling errors, before giving the final product to the client.  It is agreed that it is the client's responsibility to ensure that there are no spelling or grammatical errors contained in the final product.  It is agreed that JSL. is not responsible or held liable for any errors contained in the final product after the final product has been committed to print or posted in view of the public.

## CANCELLATION

CLIENT may cancel this contract at anytime with 30 days written notice.  In the event of cancellation of the project, ownership of all JSL. copyrights and the original artwork and disks shall be returned and retained by JSL., and a fee for work completed, based on the contract price and expenses already incurred, shall be paid by the client.

## CONFIDENTIALITY

All correspondence and documents provided will be treated as confidential between the client and LazBro, unless both parties involved have granted consent.

## REIMBURSEMENT FOR EXPENSES AND TRAVEL

All expenses shall be approved in writing in advance by CLIENT. CLIENT shall reimburse JSL for all reasonable expenses incurred by JSL in the performance of services, including but not limited to, living and administrative expenses incurred by employees of JSL while away from JSL's principal offices in Atlanta, GA. All travel by JSL personnel shall be in accordance with JSL's standard policy governing travel and business expenses, CLIENT shall further reimburse JSL for any and all special or unusual expenses incurred at the request of the CLIENT.

## RESTRICTED ACTIVITIES

During the term and for a period of two (2) years thereafter, both parties will not, directly or indirectly:

(i)     Solicit or request any employee of or consultant to the other party to leave the employ of or cease consulting for the other party

(ii)    Solicit or request any employee of or consultant to the other party to join the employ of, or begin consulting for, any individual or entity that researches, develops, markets or sells products that compete with those of the other party

(iii)   Induce or attempt to induce any supplier or vendor of the other party to terminate or breach any written or oral agreement or understanding with the other party.



**JSL ENTERPRISES** LLC

a growth and expansion agency for small business

JSL Enterprises, LLC

Signed By: _____

Printed Name: Evan Lazarus

Title: CEO

Date: 04/08/19


THS Group, LLC

Signed By: _____

Printed Name: DAVID SERUYA

Title: CEO

Date: 4/8/19


Tel: 904.800.9887   |   info@therealjsl.com   |   TheRealJSL.com



a growth and expansion agency for small business

# EXHIBIT B

SOFTWARE RESELLER AGREEMENT
Reseller Contract Number: 100015
Date: 06/05/2019

This Software Reseller Agreement (this "Agreement") is made by and between Covalent Marketing, a Limited Liability Company, with a place of business at 20 W. Kinzie St., 17th FL., Chicago, IL ("Company") and _THS Group, LLC, having a place of business at _300 McGaw Drive Edison NJ 08837("Client") (herein individually referred to as the "Party" or collectively as the "Parties").

| Name of Client: Total Home Protetion | Contact Name: Joe Ellis |
|---|---|
| Address: 300 McGaw Drive Second Floor Edison NJ 08837 | Phone: 404.358.5346 |
| Fax: | E-Mail: jellis@totalhomeprotection.com |

Client desires to access and use in its own business operations certain proprietary software of Company, or which the Company resells, that is provided by Company under a hosted "software as a service" ("SaaS") model.  By signing below, the parties agree to the terms and conditions of this Agreement, including without limitation, the standard terms and conditions attached hereto and all applicable Schedules thereto.  In the event any Affiliate of Client executes a Schedule with Company or its Affiliates, the parties understand and agree that by such execution, the Affiliate acknowledges the terms and conditions of this Agreement and agrees to be bound by the same.

Any different or additional terms of a related purchase order, confirmation, or similar form shall have no force or effect on this Agreement or its subject matter, and pre-printed or standard terms of Client's purchase order, and any click-wrap, shrink-wrap, or click-through terms are specifically excluded.  This Agreement may be executed in counterparts, each of which will be considered an original, but all of which together will constitute the same instrument.  Once signed, any reproduction of this Agreement made by reliable means (e.g., photocopy, portable document format (PDF), or facsimile) shall be considered an original.

1. DEFINITIONS
   a. **"Affiliate(s)"** means any entity that owns or controls, is owned or controlled by, or is under common control or ownership with a party, where "control" is defined as the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity.
   b. **"Content"** is all data, software and information including, without limitation, any hypertext markup language fields, email messages, scripts, programs, recording, sound, video, music, graphics, images, applets or servlets that the Client creates, installs, uploads, receives from a third party or transfer in connection with the Client's use of the SaaS Product.
   c. **"SaaS Owner"** means the organization that owns the rights and governs the SaaS Product.
   d. **"SaaS Product"** means the proprietary computer software programs of Company, its Affiliates, or which Company resells on behalf of a partner as described in one or more Schedules attached hereto, including any updates and new releases thereto.
   e. **"Schedule(s)"** means a written schedule referencing this Agreement executed by the parties that describes the specific Company Services to be provided to Client (including the features and functionalities of the applicable underlying software) and that sets forth the fees that apply.
   f. **"Service(s)"** means the online services described in a Schedule and delivered by Company to Client utilizing the SaaS Product, as made available to Client pursuant to this Agreement through the access methods described in the applicable Schedules.
   g. **"Subscription Period"** means the contractual duration that the Client has contracted the use of a SaaS Product from the Company.
   h. **"Support Period"** means the point at which the new Services are complete and the support of them begins.

Confidential. Disclose and distribute solely to those individuals who have a need to know.

i.  "**Territory**" means the United States and all United States territories.
j.  "**Proof of Entitlement**" ("**PoE**") will be held by Company and Company will provide the related SaaS platform access to Client.

2.  OWNERSHIP
Client agrees that title to, ownership of and all rights in and to patents, copyrights, trademarks, and all other intellectual property rights in the SaaS Product, and any copy or part of the SaaS Product will remain with the SaaS Owner and its suppliers.

3.  TERMS
The term of the Agreement will commence on the date Company notifies Client of their access to the SaaS Product, as documented in the Proof of Entitlement.

   a.  **License to Access and Use Company Services**
   Subject to the terms and conditions of this Agreement, Company grants to Client, during the term specified in Appendix A, a revocable, non-exclusive, non-transferable right to remotely access and use Company's Services in the Territory (i) solely for the performance of Client's or its Affiliates' internal business purposes in accordance with the permitted purposes set forth in an applicable Schedule, and (ii) to allow third parties to do the same if on behalf of and solely for the benefit of Client or its Affiliate.

   b.  **General Terms of Use (TOU)**
   Client agrees to comply with the Terms of Use for SaaS Products acquired under this Agreement.  By accepting the terms of this Agreement, Client is accepting the Company's Terms of Use and subsequently the SaaS Owner's Terms of Use.

   > IBM makes current versions of its IBM Terms of Use documents for IBM SaaS Products available on the following IBM internet website: http://www-03.ibm.com/software/sla/sladb.nsf/sla/tou/.
   >
   > Client represents that they have read the IBM Terms of Use and agree to monitor the website regularly for changes to the IBM Terms of Use.  Such changes are effective immediately when they are posted to the website.

   Company or the SaaS Owner may change their Terms of Use document at any time by providing Company with notice as provided in the Agreement or the SaaS Owner by the posting a revised SaaS Product Terms of Use on the above website.

   c.  **Renewal**
   The PoE will specify whether the Cloud Service renews automatically, proceeds on a continuous use basis, or terminates at the end of the term. 90 days prior to expiration of the Initial Term, Client shall notify Company regarding its intent to renew for additional terms of one (1) year or more.  If Client agrees in writing within 90 days of the Client's renewal notification, the Agreement and any Orders shall renew annually according to the negotiated terms for subsequent years ("Renewal Terms").

   d.  **Termination**
   Upon expiration or termination of all Schedules or Services, either party may terminate this Agreement upon thirty (30) days written notice.

4.  INDEMNITY
Client agree to indemnify, defend and hold Company and SaaS Owner harmless against any third party claim that any Content was posted to the SaaS Product in violation the Client's obligations under the General Terms of Use, as applicable.

Confidential.  Disclose and distribute solely to those individuals who have a need to know.

5. <u>SUPPORT</u>
Company will be the first line (Tier 1) of support for Client. When Client encounters technical issues that require support, Client will need to contact Company support to open a ticket, and Company will follow up accordingly, which may or may not involve opening a parallel support ticket with a 3rd party vendor.

For a new implementation, the Support Period will start once the initial implementation has taken place and the system is actively sending data to the Client's consumers (e.g. customers, prospects, members, patients, students, etc.). Until then, the Company implementation team will handle support related issues as they arise, and that the Company implementation team will be in direct contact with related individuals at Client. Once the initial implementation is completed, a transition to support call will take place, where all the related details will be communicated.

The following information in this section serves as a preview of how the support processes will work.

   a.  **Operating Hours**
       Standard business hours are from Monday through Friday 8:30am to 5pm Central Time with the exception of business holidays.

   b.  **Opening a Ticket**
       To open a support ticket with the Company, you can either send an email to SaaSSupport@CovalentMarketing.com or call your support representative (which will be communicated once the support phase begins).

   c.  **Resolutions**
       If the SaaS Owner is a 3rd party, they have the right to contact Client directly to (i) resolve service issues referred to SaaS Owner by Company or that SaaS Owner received directly through a Client complaint and (ii) monitor Client's satisfaction with Company's services.  SaaS Owner may independently conduct satisfaction surveys with Client.

6. <u>PAYMENT</u>
   a.  **Subscription**
       SaaS Product subscriptions will be periodically invoiced as defined in Appendix A.  Subscription invoices are on a Net 15 payment cycle.

   b.  **Overages**
       If Client's actual usage of the SaaS Product during the measurement period exceeds the entitlement stated on the associated PoE, then Client will be invoiced for the overage.  Client will be invoiced in arrears for overage charges each month, at the overage rate specified in the associated PoE, once the total aggregate has been reached. Such overage charges are due in addition to the base monthly entitlement charge. If the Subscription Period is greater than 12 months, the aggregate total number of entitlements will be based on 12 monthly measuring periods. The aggregate total will reset to zero after the 12th monthly measuring period. Overage charges for the next 12 monthly measuring periods will not be due until the actual interaction usage exceeds entitlements stated on the PoE.

       Related overage invoices are on a Net 15 payment cycle.

7. <u>WARRANTY</u>
SUBJECT TO ANY STATUTORY WARRANTIES WHICH CAN NOT BE EXCLUDED, COMPANY NOR ANY OTHER SAAS OWNERS MAKE NO WARRANTIES OR CONDITIONS, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE USE OF THE SAAS PRODUCT, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT.

8. <u>CONFIDENTIALITY</u>
In the performance of or otherwise in connection with this Agreement, one party ("Discloser") may disclose to the other party ("Recipient") certain Confidential Information of the Discloser. "Confidential Information" shall mean all information obtained by the Recipient from the Discloser that is not generally known to the public and that a reasonable business person would deem confidential. The Recipient will treat Confidential Information as confidential and proprietary of the Discloser

Confidential. Disclose and distribute solely to those individuals who have a need to know.

during, and, until two (2) years after expiration (or earlier termination of this Agreement), will: (a) use the Confidential Information solely for the purposes set forth in this Agreement; (b) take suitable measures to maintain the confidentiality of the Confidential Information of the Discloser; and (c) not disclose or otherwise furnish the Confidential Information to any third party other than employees or independent contractors of the Recipient who have a need to know the Confidential Information to perform its obligations under this Agreement, and with whom Recipient has entered into a written confidentiality agreement under which that third party agrees to the same level of restrictions as required under this Agreement. The obligations set forth in this section shall not apply to any: (i) approved use or approved disclosure of any information pursuant to the exercise of the Discloser's rights under this Agreement; (ii) information that is now or hereafter becomes generally known or available to the public other than through a violation of this Agreement; (iii) information that is obtained by the Recipient from a third party (other than in connection with this Agreement) who was not under any obligation of secrecy or confidentiality with respect to such information; (iv) information that is independently developed by the Recipient without reference to any Confidential Information; (v) any disclosure required by applicable law or court order, provided that the Recipient will use reasonable efforts to give advance notice to and cooperate with the Discloser in connection with any such disclosure, and provided further that the Recipient shall limit such disclosure to only that information that is required to be disclosed; and (vi) any disclosure made with the explicit consent of the Discloser. The Recipient shall promptly return to the Discloser all copies of any Confidential Information of the Discloser in its possession or control upon request, or in any event, upon any termination or expiration of the term.

9.   MISCELLANEOUS

   a.  **Governing Law; Dispute Resolution**
       This Agreement is governed by the laws of the State of Colorado , without reference to conflict of laws principles. The parties explicitly disclaim the application of the United Nation's Convention on the Sale of Goods. Except as set forth below, any dispute, controversy, or claim arising under, out of, or relating to this Agreement, including, without limitation, its formation, validity, binding effect, interpretation, performance, breach or termination, as well as non-contractual claims, will be finally determined by arbitration conducted by the American Arbitration Association ("AAA") in accordance with the Rules for Arbitration of Commercial Disputes of the AAA applicable to commercial disputes ("Rules") by one (1) arbiter, who will be skilled and experienced in technology licensing and product distribution matters. The parties will jointly select the arbiter. If the parties cannot reach agreement on the selection of an arbiter, then the AAA will determine the identity of the arbiter in accordance with the Rules, if applicable. The place of such arbitration will be in Denver, Colorado , United States. The judgment of the arbitration will be final, nonappealable (to the extent not inconsistent with applicable law) and binding upon the parties, and judgment may be entered upon the arbitral award in any court of competent jurisdiction. The arbitrator will not be empowered to award damages in excess of actual damages. Notwithstanding the foregoing, either party may apply to a court of competent jurisdiction for interim relief, including, without limitation, injunctive relief to enforce or protect any of its intellectual property rights in any court of competent jurisdiction without reference to the arbitration proceedings set forth herein.

   b.  **Notices**
       All notices required in connection with this Agreement must be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified; or (ii) three (3) days after the date of mailing, if sent by certified or registered mail. All notices shall be sent to the address set forth on the cover page of this Agreement. Either party may change its address by giving notice of the new address to the other party in writing.

   c.  **Force Majeure**
       Neither Party shall be liable hereunder by reason of any failure or delay in the performance of its obligations hereunder on account of strikes, shortages, riots, insurrection, fires, flood, storm, explosions, acts of God, war, governmental action, labor conditions, earthquakes, material shortages or any other cause which is beyond the reasonable control of such party (a **"Force Majeure Event"**); provided, however, that the affected Party (i) had taken commercially reasonable actions to avoid such Force Majeure Event before its occurrence; (ii) continues to take commercially reasonable actions to mitigate the effects of such Force Majeure Event after its occurrence, and (iii) notifies the other Party of such Force Majeure Event as soon as commercially reasonable given the circumstances. If such Force Majeure Event prevents or materially degrades performance hereunder for more than 30 days, the non-affected Party may terminate this Agreement or the applicable Schedule upon written notice to the other Party.

   d.  **Non-Exclusive**

Confidential. Disclose and distribute solely to those individuals who have a need to know.

This Agreement shall not be construed to limit or prohibit Company or its licensors from providing products and/or services of any type or nature, including those identical to the Company Services, to any other customer in its sole discretion. Similarly, this Agreement shall not be construed as limiting or prohibiting Client or its Affiliates from procuring products and/or services of any type, including products and/or services similar or identical to those provided under this Agreement, from any third party, including a competitor of Company. Client is not required to purchase the Company Services or pay any amounts to Company unless and until a Schedule is executed between the parties.

d. **Miscellaneous:** If any part of this Agreement is found invalid, such invalidity will not affect the validity of remaining portions of this Agreement; and, the Parties will substitute for the invalid provision a provision that most closely approximates the intent and economic effect of the invalid provision. Failure by either Party to complain of any act or failure to act of the other Party or to declare the other Party in default, irrespective of the duration of such default, will not constitute a waiver of rights hereunder.

e. **Entire Agreement**
This Agreement (including all Schedules, exhibits and attachments) constitutes the entire agreement between the Parties regarding the subject matter hereof and supersedes all prior or contemporaneous agreements, understandings, and communication, whether written or oral regarding such subject matter. This Agreement may be amended only by a written document signed by both Parties.

Confidential. Disclose and distribute solely to those individuals who have a need to know.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and agreed to the terms.

**COVALENT MARKETING LLC**                                    **CLIENT**

_____/___06/06/2019___        _____ _6/6/2019_____
Signature,           Date                                    Signature,           Date

__Ryan Kosanic_____        ____Joe Ellis_____
**Printed Name**                                             Printed Name

__CEO_____        ___Marketing Director_____
**Title**                                                    Title


**Please fax or email the signed copy to:**
312-276-8081 - (this is an eFax number / no cover page required).
contracts@covalentmarketing.com

Confidential. Disclose and distribute solely to those individuals who have a need to know.

APPENDIX A – Product(s) Purchased and Terms

Client is purchasing a 12-month subscription for the following SaaS Product(s) and terms are as follows:

- IBM Watson Campaign Automation
- IBM Watson Campaign Automation SMS
- IBM Watson Marketing WeatherFX

APPENDIX B – Covalent Marketing Quote _____

Confidential. Disclose and distribute solely to those individuals who have a need to know.

# EXHIBIT C

# PURCHASE ORDER

THS GROUP LLC
300 McGaw Drive, 2nd Floor
Edison, NJ 08837
(800) 545-0402
info@totalhomeprotection.com

PO No : 1801
Date : 7/15/2019

Covalent Marketing
20 W. Kinzie Street, 17th Fl
Chicago, IL 60610
(312) 265-0742

| Quantity | Description | Unit Price | Line Total |
|---|---|---|---|
| 1 | IBM Watson Campaign Automation Subscription and Setup | | $    24,686.83 |
| | (first month software subscription and setup/onboarding) | | |

Authoirzed By:

| | | |
|---|---|---|
| Subtotal | $ | 24,686.83 |
| | $ | - |
| **TOTAL** | $ | 24,686.83 |

# EXHIBIT D

## MUTUAL RELEASE AGREEMENT

This RELEASE AGREEMENT ("Agreement") is made this _____ day of _____, 2020 by and between Crawford Carpenter ("Releasor" or "CC"), Policy No. 786685055 (the "Policy") and THS Group, LLC d/b/a Total Home Protection ("Releasee" or "THS").

The Parties to this Agreement wish to resolve all disputes between the Parties, including but not limited to, Claim No. 572305,568265, 562588 (the "Claim") and therefore agree as follows:

**1.Release.** For the consideration described below, Releasor, CC, hereby irrevocably, fully, and unconditionally releases Releasee, THS, and its past, present, and future parents, partners, affiliates, subsidiaries, directors, officers, shareholders, employees, agents, predecessors, successors, representatives, attorneys (and employees and associates thereof), heirs, executors, administrators, or assigns, from all known or unknown claims, judgements, suits, or challenges of any nature whatsoever, including any and all legal, equitable or other claims, counterclaims, cross-claims, third-party claims, complaints, causes of action, arbitration proceedings, suits in law or equity, and demands whatsoever, liquidated or unliquidated, from the beginning of the world to the date of this Agreement, all of which are fully released by the Releasor. In addition, the Releasor waives any rights to assert any claims against the Releasee as a representative or member in any class or representative action.

**2. Releasee' Obligations.** In consideration of the foregoing, Releasee agrees to provide Releasor, within 15 days of the execution of this Agreement the sum of $1,000.00 (the "Payment").

**3. Execution.** This Agreement shall be binding upon the undersigned. Releasor has read and understood all the terms & conditions listed in this Agreement.

**4. Mutual Release.** Further, THS hereby mutually releases any and all claims against Crawford Carpenter and his representatives. The undersigned warrants and represents that the undersigned is authorized to execute this Mutual Release on behalf of THS.

**5. Counterparts.** This Mutual Release Agreement may be signed by the Parties in counterparts, the combination of which shall be as valid and binding as a fully executed original.

By: _Crawford Carpenter_                          Date: 5-18-2020
    Crawford Carpenter


By: _____ David Saruya, CEO        Date: 5/18/20
    Name, Title
    THS Group, LLC d/b/a Total Home Protection

SETTLEMENT OF CLAIM

      THIS SETTLEMENT AGREEMENT (the "Settlement Agreement") is made this _____ day of _____, 2020, by and among Elizabeth Dietrich ("Dietrich") and THS Group LLC dba Total Home Protection ("THS" and together with Dietrich, the "Parties").

      WHEREAS, on or about January 8, 2020, Dietrich filed suit against THS in the United States District Court for the Eastern District of Pennsylvania, Civil Action number 2:20-cv-00154-CDJ (the "Action");

      WHEREAS, the Parties have agreed to resolve the litigation and all claims brought thereunder, with neither party admitting any liability for the matters specified above;

      WHEREAS, the terms and provisions of the Settlement Agreement have been negotiated at arm's length and have been agreed to by the Parties in good faith; and

      NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein and with the intent to be legally bound, it is hereby agreed between the undersigned as follows:

1. Within ten (10) business days of this settlement agreement being signed by the Parties, THS will pay the sum of TEN THOUSAND DOLLARS ($10,000.00) inclusive of attorney's fees and costs by wire transfer (Bankwell; 208 Elm Street, New Canaan, CT 06840; Routing number 021113662; Beneficiary: Lemberg Law LLC; IOLTA account; 43 Danbury Road, Wilton, CT 06897; Account number 0340218148).

2. Within ten (10) days, or as soon as possible thereafter, of this settlement agreement being signed by the Parties, THS will close its account related to Dietrich (the "Account"), will not take any further collection activities with respect to the debt represented by the Account, and will delete any and all negative credit reporting history reported by THS in regard to the Account.

3. The parties waive any right to assert any claims against the other party as a representative or member in any class or representative action.

4. Dietrich agrees not to post any negative reviews against THS including but not limited to Facebook, Better Business Bureau, review websites, blog posts, and any and all social media. If applicable, Dietrich agrees to remove, delete, and erase any and all negative reviews posted online against THS, including but not limited to Facebook, Better Business Bureau, review websites, blog posts, and any and all social media. Dietrich also agrees to close out any and all consumer complaints as resolved and/or satisfactory.

5. Effective upon receipt of settlement funds, Dietrich shall release and discharge THS and its successors, assignors, assignees, predecessors, direct and indirect subsidiaries, affiliates, shareholders, employees, officers, directors, attorneys and agents (collectively, the "THS Released Parties"), from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, extents, executions, judgments, claims, damages, costs, liens, liabilities, and demands, whatsoever, in law, admiralty, equity, known or unknown, which against THS Released Parties, Dietrich ever had, now has, or hereafter can, shall or may have, relating to THS's attempts to collect the debt at the nucleus of the current action, from the beginning of the world to the day of the date of this settlement agreement, except for the agreements and promises contained in this agreement.

6. Effective upon receipt of settlement funds, THS shall release and discharge Dietrich and his successors, assignors, assignees, predecessors, direct and indirect subsidiaries, affiliates, shareholders, employees, officers, directors, attorneys and agents (collectively, "Dietrich Released Parties"), from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, extents, executions, judgments, claims, damages, costs, liens, liabilities, and demands, whatsoever, in law, admiralty, equity, known or unknown, which against Dietrich Released Parties, THS ever had, now has, or hereafter can, shall or may have, relating to THS's attempts to collect the debt at the nucleus of the current action, from the beginning of the world to the day of the date of this settlement agreement, except for the agreements and promises contained in this agreement.

7. Each party, by execution of this settlement agreement, represents and warrants that he, she, or it is fully authorized to enter into and bind each of the Parties to this settlement and perform this

settlement agreement without any further or other consent or authorization from any person or entity.

8. This settlement agreement constitutes the full and final agreement of the Parties pertaining to its subject matter, and all prior or contemporaneous understanding or agreements, whether written or oral, between the Parties with respect to such subject matter are hereby superseded in their entirety. The parties have made no agreements, representations or warranties relating to the subject matter of this settlement agreement that are not set forth herein; and no agreement, understanding or promise subsequent to the date hereof relating to the Subject Matter of this agreement, between or by the Parties, shall be binding unless in writing and executed by the Parties. No Party shall be entitled to rely on oral statements made by any other Party which are not contained in a written agreement between the Parties. The settlement agreement set forth herein may be modified, amended or waived only by separate written agreement of each of the Parties expressly so modifying, waiving or amending such agreement.

9. This settlement agreement shall be governed and construed in accordance with the laws of Pennsylvania without giving effect to any conflict of law provisions.

10. The Parties agree to keep all matters pertaining to this action fully confidential.

11. Should Defendant default on its obligation under this agreement, Plaintiff shall first have an obligation to notify Defendant and allow Defendant five days from the date of notification to cure the default without further cost or penalty. However, should Defendant default and fail to cure after notification, Plaintiff shall be entitled to treat this agreement as a judgment against Defendant. Should it become necessary for either party to enforce the terms and conditions of this Release, the prevailing party is entitled to reasonable attorney's fees and costs.

12. The Parties agree that the United States District Court for the Eastern District of Pennsylvania shall have exclusive jurisdiction over all matters related to the enforcement of this agreement.

13. Except as otherwise expressly provided, nothing in this agreement shall be construed as an admission by any Party of any alleged liability, fault or wrongdoing or that any of their claims is without merit or lacks validity.

14. This settlement agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Dated this 14 day of April, 2020

Signed by Elizabeth Dietrich:

_____

Dated this 14 day of April, 2020

THS Group LLC dba Total Home Protection

By: _____

Its Duly Authorized Representative: _____

# CONFIDENTIAL SETTLEMENT AGREEMENT

This CONFIDENTIAL SETTLEMENT AGREEMENT (the "Agreement") is entered into the date the last party to the Agreement signs (the "Effective Date"), between Gerard F. Jackson ("Plaintiff") and THS Group LLC d/b/a Total Home Protection ("Defendant"). Plaintiff and Defendant are collectively referred to herein as the "Parties."

WHEREAS, on January 29th, 2020, Plaintiff filed a Complaint in the Court of Common Pleas of Centre County Pennsylvania Docket No.: 2020 - 0353 (the "Lawsuit"), alleging that Defendant made or caused to be made, unsolicited marketing telephone calls to Plaintiff's cell phone and asserting claims under the Telephone Consumer Protection Act ("TCPA") (47 U.S.C. §227) and relevant federal regulations (47 C.F.R. § 64.1200), under the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 P.S. § 201-1 et seq.) and Pennsylvania Telemarketer Registration Act (73 P.S. 2241 et seq.); and

WHEREAS, Defendant by entering into this Agreement do not admit liability to Plaintiff in any manner; and

WHEREAS, the Parties have determined that it is in their mutual best interests to settle this matter and to stipulate to the dismissal of all of Plaintiff's claims asserted in the Complaint with prejudice; and

WHEREAS, the Parties expressly agree that this Agreement is not, and shall not be construed as, an admission as to their actual rights, obligations or liabilities, and the Parties specifically deny any obligation to each other; and

WHEREAS, the Parties enter into this Agreement solely to avoid the uncertainties, expense, and inconvenience of litigation.

NOW THEREFORE, in consideration of the foregoing recitals which are incorporated into and are a part of this Agreement, and the promises, conditions, and covenants contained in this Agreement, and other good and valuable consideration, the adequacy of which is acknowledged, the Parties agree as follows:

1.    **Payment**. Defendant shall pay to Plaintiff the total sum of Five Thousand and 00/100 Dollars ($5,000.00) (the "Settlement Payment"). The Settlement Payment shall be made within five (5) days from the Effective Date, by wire transfer (instructions for wire transfer will be provided by Plaintiff's counsel if requested by Defendant) or check payable to "Bower Law Associates, PLLC Client Trust Account".

The Settlement Payments is to be sent to:

Bower Law Associates, PLLC
403 South Allen Street, Suite 210
State College, PA 16801

1

2.    **Release by the Parties.**  In consideration of the Settlement Payment called for herein, the Parties completely release and forever discharge each other, together with their, successors, attorneys, and to the extent applicable their employees, members, directors, officers, and executives from any and all past, present, or future claims, demands, obligations, actions, causes of action of any type, whether based in tort, contract, breach of warranty, statutory or other theory of recovery, which either now has, or which may hereafter accrue or otherwise be acquired, on account of, or in any way growing out of any act by any of the Parties that occurred on or before the Effective Date, including, without limitation, any and all known or unknown claims for statutory damages, lost wages and profits, punitive damages and loss or damages of any kind.  The Parties intend to release all claims whatsoever that were or could have been made in any lawsuit brought by either of the Parties, including, but not limited to class action claims.

2.1    **Plaintiff's Representations and Warranties.**  Plaintiff, on behalf of himself and Plaintiff's agents and representatives, represents and warrants that (1) Plaintiff does not intend to bring any other claims against a Defendant, including, but not limited to a class action claim; (2) Plaintiff is not seeking any plaintiffs or potential plaintiffs for the purposes of initiating any claim or lawsuit against Defendant; (3) Plaintiff will not seek or solicit plaintiffs or potential plaintiffs for the purposes of initiating any claim or lawsuit against Defendant (4) Plaintiff has not and will not communicate any information concerning the Lawsuit to any potential class members or third parties for the purposes of assisting or encouraging the filing or prosecution of any action or proceeding against Defendant; and (5) Plaintiff has not disclosed to any third party the existence, terms or substance of any part of the settlement negotiations between the Parties, or the existence, terms or substance of any part of this Agreement.

3.    **Dismissal of Claims.**  Plaintiff will file a Praecipe to Settle, Discontinue and End with Prejudice Against Defendant for the Lawsuit in the Court of Common Pleas for the Lawsuit within five (5) business days of receipt of the Settlement Payment.

4.    **No Admission.**  This Agreement is the result of compromise by and among the Plaintiff and Defendant and is not and shall not be considered as an admission of the truth of any allegations of wrongdoing, claims, contentions, or defenses that any party may have against the other party, it being expressly understood and acknowledged that all parties hereto deny any allegations of, or any liability for, any claims by the other parties.

5.    **Confidentiality.**  The Parties, and their counsel, agree that the terms of this Agreement shall be and remain confidential among them, and their counsel, and shall not be disclosed to any other individual or entity whatsoever, except only (a) as required by law or order of court, (b) to an accountant or other tax professional concerning the Agreement's tax consequences, or (c) to a court, an attorney, or other legal representative as necessary to enforce the provisions of this Agreement.

6.    **Authority.**  The Parties hereby represent to each other that they have full power and authority to enter into this Agreement and carry out their obligations. All Parties further represent that (a) all necessary corporate action has been duly taken to authorize the execution and delivery of this Agreement and (b) that this Agreement has been duly executed.

2

7.    **No Assignment**.   Plaintiff represents and warrants that it is the sole and current owner of the claims being released in this Agreement and that any such claims have not been assigned or otherwise transferred to any other person or entity.

8.    **Advice of Counsel**.   The Parties respectively acknowledge that they have consulted with legal counsel of their choice before entering into and executing this Agreement. Further, both Parties, through their respective counsel, either have or had the opportunity to participate in the drafting of this Agreement and agree that in construing the terms of this Agreement, the terms are not to be strictly construed against either Party.

9.    **Counterparts**.   This Agreement may be executed by each of the Parties in counterparts with the same effect as if the Parties had signed the same copy.  Facsimile signatures or signatures transmitted via electronic means shall be accepted as original signatures.

10.   **General**.  This Agreement shall be governed and enforced in accordance with the laws of the Commonwealth of Pennsylvania and shall inure to the benefit of and be binding upon the Parties and their respective heirs, executors, successors, and assigns.  The recitals set forth in the beginning of this Agreement are incorporated herein.  This Agreement consists of 11 separately numbered paragraphs contained in three (3) pages including signatures.  The warranties and representations made herein survive the execution of this Agreement.

11.   **Entire Agreement.**  Any and all prior understandings and agreements between the Parties with respect to the subject matter of this Agreement are merged into and with this Agreement and the exhibits hereto, which fully and completely express the entire agreement and understanding of the Parties with respect to the subject matter of the Agreement. This Agreement may be amended, modified or changed only by a written instrument of the Parties and may not be amended, modified or changed orally.

**AGREED:**

| **PLAINTIFF** | **DEFENDANT** |
|---|---|
| **GERARD F. JACKSON** | **THS GROUP LLC** |

*Gerard F. Jackson*

Gerard F. Jackson

Date: *APR 6, 2020*

By: _____

[Print Name and Title]

Date: _____

3

SETTLEMENT OF CLAIM

THIS SETTLEMENT AGREEMENT (the "Settlement Agreement") is made this __27th__ day of April, 2020, by and among Tammy McCrae-Coley ("McCrae-Coley") and THS Group LLC dba Total Home Protection ("THS" and together with "McCrae-Coley", the "Parties").

WHEREAS, on or about February 28, 2020, McCrae-Coley filed suit against THS in the State of North Carolina, Guilford County, In the General Court of Justice, Superior Court Division entitled Tammy McCrae-Coley, Plaintiff vs. The Group LLC, d/b/a Total Home Protection, Defendant, under File Number 20CVS3645 (the "Action");

WHEREAS, the Parties have agreed to resolve the litigation and all claims brought thereunder, with neither party admitting any liability for the matters specified above;

WHEREAS, the terms and provisions of the Settlement Agreement have been negotiated at arm's length and have been agreed to by the Parties in good faith; and

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein and with the intent to be legally bound, it is hereby agreed between the undersigned as follows:

1. This matter is settled for the sum of TWENTY TWO THOUSAND DOLLARS ($22,000.00) to be paid as followed:

   Within five (5) business days after this settlement agreement is signed by the Parties, THS will pay the first installment in sum of ELEVEN THOUSAND DOLLARS ($11,000.00) payable to "O'Neal Law Office and Tammy McCrae-Coley" mailed to O'Neal Law Office, 7 Battleground Court, Suite 103, Greensboro, NC 27408, Attn: John O'Neal, Esq.

   Within thirty (30) days after this settlement agreement is signed by the Parties, THS will pay the final installment in the sum of ELEVEN THOUSAND DOLLARS ($11,000.00) payable to "O'Neal Law Office and Tammy McCrae-Coley" mailed to O'Neal Law Office, 7 Battleground Court, Suite 103, Greensboro, NC 27408, Attn: John O'Neal, Esq.

2. The parties waive any right to assert any claims against the other party as a representative or member in any class or representative action.

3. McCrae-Coley agrees not to post any negative reviews against THS including but not limited to Facebook, Better Business Bureau, review websites, blog posts, and any and all social media. If applicable, McCrae-Coley agrees to remove, delete, and erase any and all negative reviews posted online against THS, including but not limited to Facebook, Better Business Bureau, review websites, blog posts, and any and all social media. McCrae-Coley also agrees to close out any and all consumer complaints as resolved and/or satisfactory.

4. **THS agrees not to post any negative reviews against McCrae-Coley including but not limited to Facebook, Better Business Bureau, review websites, blog posts, and any and all social media. If applicable, THS agrees to remove, delete, and erase any and all negative reviews posted online against McCrae-Coley, including but not limited to Facebook, Better Business Bureau, review websites, blog posts, and any and all social media.**

5. Effective upon receipt of final settlement funds, McCrae-Coley shall release and discharge THS and its successors, assignors, assignees, predecessors, direct and indirect subsidiaries, affiliates, shareholders, employees, officers, directors, attorneys and agents (collectively, the "THS Released Parties"), from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, extents, executions, judgments, claims, damages, costs, liens, liabilities, and demands, whatsoever, in law, admiralty, equity, known or unknown, which against THS Released Parties, McCrae-Coley ever had, now has, or hereafter can, shall or may have, relating to THS's attempts to collect the debt at the nucleus of the current action, from the beginning of the world to the day of the date of this settlement agreement, except for the agreements and promises contained in this agreement.

6. Effective upon receipt of settlement funds, THS shall release and discharge McCrae-Coley and her successors, assignors, assignees, predecessors, direct and indirect subsidiaries, affiliates, shareholders, employees, officers, directors, attorneys and agents (collectively, "McCrae-Coley Released Parties"), from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, extents, executions, judgments, claims, damages, costs, liens, liabilities, and demands, whatsoever, in law, admiralty, equity, known or unknown, which against McCrae-Coley Released Parties, THS ever had, now has, or hereafter can, shall or may have, relating to THS's attempts to collect the debt at the nucleus of the current action, from the beginning of the world to the day of the date of this settlement agreement, except for the agreements and promises contained in this agreement.

7. Each party, by execution of this settlement agreement, represents and warrants that he, she, or it is fully authorized to enter into and bind each of the Parties to this settlement and perform this settlement agreement without any further or other consent or authorization from any person or entity.

8. This settlement agreement constitutes the full and final agreement of the Parties pertaining to its subject matter, and all prior or contemporaneous understanding or agreements, whether written or oral, between the Parties with respect to such subject matter are hereby superseded in their entirety. The parties have made no agreements, representations or warranties relating to the subject matter of this settlement agreement that are not set forth herein; and no agreement, understanding or promise subsequent to the date hereof relating to the Subject Matter of this agreement, between or by the Parties, shall be binding unless in writing and executed by the Parties. No Party shall be entitled to rely on oral statements made by any other Party which are not contained in a written agreement between the Parties. The settlement agreement set forth herein may be modified, amended or waived only by separate written agreement of each of the Parties expressly so modifying, waiving or amending such agreement.

9. This settlement agreement shall be governed and construed in accordance with the laws of North Carolina without giving effect to any conflict of law provisions.

10. The Parties agree to keep all matters pertaining to this action fully confidential.

11. Should Defendant default on its obligation under this agreement, Plaintiff shall first have an obligation to notify Defendant and allow Defendant five days from the date of notification to cure the default without further cost or penalty.

12. The Parties agree that the State of North Carolina, Guilford County, In the General Court of Justice, Superior Court Division shall have exclusive jurisdiction over all matters related to the enforcement of this agreement.

13. Except as otherwise expressly provided, nothing in this agreement shall be construed as an admission by any Party of any alleged liability, fault or wrongdoing or that any of their claims is without merit or lacks validity.

14. This settlement agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Dated this 24th day of April, 2020

Tammy McCrae-Coley

Dated this 27th day of April, 2020

THS Group LLC dba Total Home Protection

By: _____
David Seruya, CEO

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This Confidential Settlement Agreement and Release (the "Settlement Agreement") is entered into by and between Lee Wigod ("Wigod" or "Plaintiff") and THS Group, LLC ("THS" or "Defendant"). Wigod and THS are collectively referred to as the "Parties" herein.

**WHEREAS**, Plaintiff commenced a putative class action against Defendant, in the U.S. District Court for the Northern District of Illinois alleging violations of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, *et. seq.* ("TCPA" or "Act");

**WHEREAS**, the Parties contest liability and Defendant has denied any wrongdoing or any liability or responsibility with respect to the allegations and claims asserted in the Litigation; and

**NOW THEREFORE**, in consideration of the mutual covenants and promises set forth below and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.  **No Admission of Liability.**

    1.1    The Parties have entered into this Settlement Agreement to resolve the disputes that have arisen among them and to avoid the burden, expense, and risk of litigation. In entering into this Settlement Agreement, Defendant does not admit that they violated any federal, state, local law, or any regulations or guidelines promulgated pursuant to those laws, or any other applicable laws, regulations, guidelines, or any other legal requirements.

    1.2    Neither this Settlement Agreement, nor any of its terms or provisions, nor any of the negotiations connected therewith or relating thereto, shall be construed as an admission or concession by Defendant of any violations or failure to comply with any applicable agreement, law, regulation, guideline or any other legal requirement. Nothing in this Settlement Agreement, nor in any negotiations, actions, statements or court proceedings relating to them in any way, shall be construed as, offered as, received as, used as, or deemed to be evidence or an admission of any kind in any litigation or in any judicial, administrative, regulatory or other proceeding between the Parties, except in a proceeding to enforce the terms of this Settlement Agreement.

2.  **Consideration.**

    2.1    **Monetary Relief:** In consideration of the terms of this Settlement Agreement, Defendant shall pay two hundred thousand dollars ($200,000.00) to settle the Litigation by delivery in accordance with Section 2.2 of this agreement below.

    2.2    Defendants shall deliver the sum of eighty thousand dollars ($80,000.00) within ten (10) days of both Parties executing this Agreement; delivery of payment shall be made by check made payable to "Woodrow & Peluso LLC COLTAF," and sent by traceable mail to Plaintiff's attorney Patrick H. Peluso, Woodrow & Peluso, LLC, 3900 E. Mexico Ave., Suite 300, Denver, Colorado 80210. The remaining one hundred twenty thousand dollars ($120,000.00) shall be paid in twenty-four (24) equal monthly installments of five thousand dollars ($5,000) to issue on the 28th day of each consecutive month, beginning July 28, 2020. The installment payments

shall also be made by check payable to "Woodrow & Peluso LLC COLTAF" and shall be sent by traceable mail to Plaintiff's attorney Patrick H. Peluso, Woodrow & Peluso, LLC, 3900 E. Mexico Avenue, Suite 300, Denver, Colorado 80210. Each of the Settlement Payments shall be considered timely only if postmarked on the day the payment is due.

2.3   In the event that Defendant fails to make any Settlement Payment within ten (10) days of its due date, as detailed in Section 2.2, Defendant shall be in Default of its payment obligations ("Default"). In the event of Default, Plaintiff shall provide notice of the Default to Defendant's attorney, Les Kramsky, via electronic mail and U.S. mail. If the Default is not cured within fourteen (14) days of notice being provided to Les Kramsky, the remaining unpaid balance of all Settlement Payments plus an additional thirty thousand dollars ($30,000.00) shall become immediately due and payable.

2.4   Defendants, at their sole discretion, may elect to pay the full remaining balance of all Settlement Payments prior to the remaining scheduled dates of payment.

2.5   **Prospective Relief:** In addition to the monetary relief described above, Defendant agrees it shall affirmatively use commercially reasonable efforts to comply with the TCPA for a period of twenty-four (24) months, subject to any changes in applicable law. Defendant shall also provide a declaration attesting under penalty of perjury that the text message opt-out glitch which gave rise to this lawsuit has been fixed. Defendant shall also use commercially reasonable efforts to test its opt-out system on a quarterly basis going forward to ensure that no additional glitch arises.

2.6   The Settlement Payment and Prospective Relief shall be in full settlement and satisfaction of any claims that Plaintiff may have brought against Defendant, as set forth in this Settlement Agreement.

3.   **Dismissal of Claims.**

Plaintiff shall dismiss the Action with prejudice at his own expense. Plaintiff shall execute and deliver such documents as may be necessary to effect such dismissal with prejudice within twenty (21) days of receipt and clearance of the first Settlement Check. Each Party will bear his or its own attorneys' fees, litigation expenses, and costs in connection with such dismissal.

4.   **Release.**

Plaintiff hereby releases and forever discharges Defendant from any and all manner of action or actions, suits, claims, damages, judgments, levies and executions, whether known or unknown, liquidated or unliquidated, fixed or contingent, direct or indirect which Plaintiff ever had against Defendant, arising out of or related in any way to Defendant's alleged violations of the TCPA, and any other claims in this matter. Further, Plaintiff will inform no other parties about these actions, or any information learned from this litigation.

5.   **Confidentiality.**

The Parties, including their counsel, agree not to disclose or cause to be disclosed, directly or indirectly, to any other person, other than the Parties' respective legal or financial

advisors, auditors, accountants, insurance carriers, or regulators, or as required by law or court order, any information regarding the amount of, terms of, or circumstances underlying this Settlement Agreement and the litigation that has resulted in this agreement. The Parties further agree that they will not, directly or indirectly, make any statements or share any information, discovery, or any other documents of any kind in any form (orally, in writing, etc.) concerning this matter, except if asked about the resolution of this matter, the Parties, including their counsel, may only respond that the matter was settled or resolved to the satisfaction of the Parties. No disparaging statements of any kind will be made by the Parties. If any party violates this clause, they shall be deemed in breach of the agreement and the non-breaching party is entitled to all remedies available at law and any damages stemming from this breach will be indemnified by the breaching party, whether known at the time or not.

6.    **Other Agreements, Covenants and Representations.**

6.1    Plaintiff represents and warrant that they have not assigned or transferred any released claims and agrees and covenants not to sue or prosecute, institute or cooperate in the institution, commencement, filing or prosecution of any suit or proceeding in any forum based upon or related to any claim being released herein.

6.2    Each Party represents and warrants to the other Party that (a) it is duly authorized to execute and deliver this Settlement Agreement; (b) it has taken all necessary action to authorize the execution and delivery of this Settlement Agreement; (c) the execution and delivery of this Settlement Agreement will not violate any law, regulation, order, judgment, decree, ordinance, charter, bylaw or rule applicable to it or its property or constitute a default (or any event which, with notice or lapse of time, or both, would constitute a default) under or result in a breach of any material agreement or other material instrument by which it is bound or by which its assets are affected; (d) the person signing this Settlement Agreement on its behalf is duly authorized to do so; and (e) this Settlement Agreement constitutes its valid, binding and enforceable obligation, except as enforceability may be limited by bankruptcy, reorganization, insolvency, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally, and by general principles of equity regardless of whether enforceability is considered in a proceeding in equity or at law.

7.    **General Provisions.**

7.1    This Settlement Agreement contains the entire agreement and understanding between the Parties with respect to the subject matter hereto and supersedes any and all prior agreements, arrangements, or understandings of any kind or nature between the Parties with regard to such subject matter.

7.2    The Parties represent and acknowledge that in executing this Settlement Agreement they do not rely and have not relied upon any representation or statement by any other Party or any other Party's agents, attorneys or representatives with regard to the subject matter, basis, or effect of this Settlement Agreement or otherwise, other than those specifically stated in this Settlement Agreement.

3

7.3    This Settlement Agreement may not be amended, canceled, revoked or otherwise modified except by a written agreement signed by the Parties hereto.

7.4    No waiver of any of this Settlement Agreement's provisions shall be deemed or shall constitute a waiver of any other provision, whether or not similar, nor shall such waiver constitute a continuing waiver.

7.5    This Settlement Agreement may be executed in one or more counterparts, each of which when executed and delivered shall be deemed an original, and all of which when executed shall constitute one and the same instrument. A facsimile copy or e-mail copy of an executed original or counterpart original of this Settlement Agreement shall be deemed effective on the date it is received.

7.6    This Settlement Agreement shall be binding upon the Parties and upon their heirs, employees, agents, successors, affiliates, subsidiary and parent organizations, assigns, attorneys, administrators, representatives, and executors, and shall inure to the benefit of the Parties.

7.7    This Settlement Agreement shall be construed under, and shall be governed by, the laws of the State of Illinois to the exclusion of all other states' laws, without giving effect to the conflict of laws principles of such state.

7.8    This Settlement Agreement shall be interpreted in accordance with the plain meaning of its terms and not strictly for or against either Party.

7.9    Should any provision of this Settlement Agreement be declared or determined by any court of competent jurisdiction to be illegal, invalid, unenforceable, or void, said declaration or determination shall not affect the remaining terms of this Settlement Agreement and the remaining terms shall be performed by the Parties.

7.10    Each of the Parties hereto acknowledges and agrees that the Settlement Agreement's terms are contractual and not merely recitals and are the result of negotiations between parties of equal bargaining power. All recitals are incorporated by reference into this Settlement Agreement.

8.    **No Solicitation**.
        Plaintiff's Counsel represents that as of the date of execution of this Agreement for the purpose of making the representations set forth in this paragraph, they have not been retained by, and have no knowledge of, any individuals or entities, other than Plaintiff, that have or may have any potential claims, grievances, or causes of actions against Defendant similar to those asserted in the Action or that have sought to or considered retaining Plaintiff's Counsel. Plaintiff's Counsel further represent that they will not solicit such persons or refer such persons to other counsel for the purpose of bringing such claims; provided, however, that nothing in this paragraph shall be construed as a restriction of Plaintiff' Counsel's right to practice in contravention of any Rule of Professional Conduct.

4

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the Parties have executed this Settlement Agreement effective as of the date set forth below.

Dated: 07 / 02 / 2020 _____

*Lee I. Wigod*
_____
Lee Wigod

Dated: 07/02/2020 _____

_____
On behalf of the Woodrow & Peluso, LLC
(Approved as to form and content)

Dated: 7/2/2020 _____

_____
On behalf of THS Group, LLC

By: David Semya

# ☒ HELLOSIGN

Audit Trail

| | |
|---|---|
| **TITLE** | THS Settlement Agreement |
| **FILE NAME** | Wigod_Settlement_Agreement.pdf |
| **DOCUMENT ID** | 828dd2c490b016fe8425dfe333ccf8e42f64aba7 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ☉ Completed |

## Document History

| | | |
|---|---|---|
| ☝ **SENT** | **07 / 02 / 2020** 20:14:20 UTC | Sent for signature to Lee Wigod (leewigod@gmail.com) from ppeluso@woodrowpeluso.com IP: 71.229.171.108 |
| 👁 **VIEWED** | **07 / 02 / 2020** 20:22:29 UTC | Viewed by Lee Wigod (leewigod@gmail.com) IP: 99.203.79.154 |
| ⅄ **SIGNED** | **07 / 02 / 2020** 20:24:44 UTC | Signed by Lee Wigod (leewigod@gmail.com) IP: 99.203.79.154 |
| ☑ **COMPLETED** | **07 / 02 / 2020** 20:24:44 UTC | The document has been completed. |

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### NOTICE

**CONSENT TO TRIAL BY MAGISTRATE JUDGE**

Pursuant to Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c) you have the right to have your case conducted before a United States Magistrate Judge upon consent of all parties. In order to proceed before the Magistrate Judge, a consent form must be filed with the Clerk's Office. It may be filed jointly or separately. The consent form may be printed from the U.S. District Court website (listed below) or obtained from the Clerk's Office. Please refer to the previously mentioned rule for further information.


**FINANCIAL INTEREST DISCLOSURE STATEMENT**

Pursuant to Local Rule 7.1, a financial interest disclosure statement must be filed by a "nongovernmental corporation, partnership, trust, [or] other similar entity that is a party to, or that appears in, an action or proceeding in this Court." This statement should be filed with "the party's first appearance, pleading, petition, motion, response, or other request addressed to the Court. The financial interest disclosure statement may be printed from the U.S. District Court website (listed below) or obtained from the Clerk's Office. Please refer to the previously mentioned rule for further information.

**ALEXANDRIA DIVISION SPECIFIC INFORMATION**

Information regarding Alexandria Chambers Copy, Civil and Criminal Motions Procedures, and Other Division-Specific information can be found on the U.S. District Court website at:
http://www.vaed.uscourts.gov/ecf/documents/AlexandriaInformation-01-01-18_000.pdf


**WEBSITE AND CLERK'S OFFICES ADDRESSES**

The website address for the U.S. District Court for the Eastern District of Virginia is www.vaed.uscourts.gov. If you do not have access to a computer, contact one of the Clerk's Offices listed below to obtain either of these forms:

Albert V. Bryan United States Courthouse
401 Courthouse Square
Alexandria, VA 22314
(703) 299-2101

Walter E. Hoffman United States Courthouse
600 Granby Street
Norfolk, VA 23510
(757) 222-7201

Spotswood W. Robinson, III
and Robert R. Merhige, Jr. Federal Courthouse
701 East Broad Street
Suite 3000
Richmond, VA 23219
(804) 916-2220

U.S Federal Courthouse
2400 West Avenue
Newport News, VA 23607
(757) 247-0784

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

| | |
|---|---|
| Tricia Campo, individually and on behalf of all others similarly situated, | )<br>)<br>)<br>) |
| *Plaintiff(s)* | ) |
| v. | )<br>)    Civil Action No.   1:20cv925 |
| THS Group, LLC d/b/a Total Home Protection, a Pennsylvania limited liability company, | )<br>)<br>) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  THS Group, LLC d/b/a Total Home Protection
SERVE: Corporation Service Company, registered
agent Princeton South Corporate Ctr.
100 Charles Ewing Blvd, Suite 160
Ewing, NJ 08628

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Francis J. Driscoll, Jr.
> (frank@driscolllawoffice.com)
> Law Office of Frank J. Driscoll Jr. PLLC
> 4669 South Blvd., Suite 107
> Virginia Beach, VA 23452
> Tel: 757-321-0054

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:   08/17/2020          Digitally signed by Dana Van
Metre
Date: 2020.08.17 11:43:43 -04'00'

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                                    *Server's signature*

                                                                    _____
                                                                    *Printed name and title*

                                                                    _____
                                                                    *Server's address*

Additional information regarding attempted service, etc:

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

TRICIA CAMPO, individually and on behalf of
all others similarly situated,

        Plaintiff

        v.

THS GROUP, LLC, d/b/a TOTAL HOME
PROTECTION, a Pennsylvania limited liability
company,

        Defendant.

Case No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

1. Plaintiff Tricia Campo ("Campo" or "Plaintiff") brings this Class Action Complaint against Defendant THS Group, LLC d/b/a Total Home Protection ("THP" or "Defendant") to stop Defendant's practice of sending unsolicited text messages to cellular telephone users after the users' request for such messages to "Stop"—even to users who've listed their phone numbers on the national Do Not Call Registry—and to obtain redress for all persons similarly injured by Defendant's conduct. Plaintiff also seeks an award of statutory damages payable to the members of the Classes plus court costs and reasonable attorneys' fees.

2. Plaintiff, for her complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## PARTIES

3.      Plaintiff Tricia Campo is a natural person and a resident of Sterling, Loudoun County, Virginia.

4.      Defendant THS Group, LLC d/b/a Total Home Protection is a limited liability company organized in and existing under the laws of the State of Pennsylvania, with its principal place of business located at 300 McGaw Drive, 2nd Floor, Edison, New Jersey 08837. Defendant conducts business throughout this District, the State of Virginia, and the United States.

## JURISDICTION & VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the action arises under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §227, *et seq.*, a federal statute. This Court also has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332 ("CAFA"), because the alleged Classes consist of over 100 persons, there is minimal diversity, and the value claims of the class members, when aggregated, exceeds $5 million. Further, none of the exceptions to CAFA applies.

6.      This Court has personal jurisdiction over THP because it conducts a significant amount of business in this District, made and continues to make unsolicited text message calls to persons, like Plaintiff, located within this District, and because the wrongful conduct giving rise to this Complaint occurred in and was directed to this District.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant conducts a significant amount of business within this District and because the wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from this District.

## COMMON FACTUAL ALLEGATIONS

8.      Defendant THP is a home warranty company that offers service contracts to cover repair or replacement of household appliances. THP offers its service contracts to consumers across the United States, including Virginia. THP's website notes only California and Iowa as states in which its contracts are not available.[1]

9.      Unfortunately for consumers, THP engages in unlawful telemarketing. In an attempt to promote its business and to generate leads for its service contracts, which it calls "home warranty plans," Defendant conducted (and continues to conduct) a widescale telemarketing campaign that repeatedly sends unsolicited text messages to consumers even after the consumers reply "STOP" in a clear revocation of consent to receive such messages.

10.     Defendant also sends repeated unsolicited messages to consumers who have had their cellphone numbers listed on the national Do Not Call Registry ("DNC Registry") for at least thirty (30) days.

11.     At all times material to this Complaint, Defendant was and remains fully aware that unsolicited telemarketing text messages are being made to consumers' cellular telephones through its own efforts and through the efforts of its agents/vendors. Defendant was also aware that messages were being sent after consumers had responded "STOP", including consumers with phone numbers listed on the DNC Registry.

12.     Defendant's text messaging system, including without limitation its use of a short code, is an automatic telephone dialing system ("ATDS") in that it has the capacity to store and dial random numbers, *en masse*, without human intervention. The messages in this case were not transmitted individually—Defendant or its agents acting on its behalf caused the text messages to

---

[1] See https://totalhomeprotectionquote.com/.

3

be sent in an automated fashion to the Classes defined below. The messages were sent from a short code and were otherwise sent without human intervention.

13.     The text message calls were for telemarketing purposes and offered or announced the availability of goods or services, specifically deals and discounts on Defendant's home warranty service contracts.

14.     The text message calls were made by or on behalf of Defendant, with Defendant's knowledge and approval. Defendant has knowingly received the benefit of the text message calls and has ratified the making of such calls.

15.     Defendant knowingly made, and continues to make, unsolicited telemarketing text messages without the consent of the recipients and knowingly continued to send messages after requests to "Stop." In doing so, Defendant not only invaded the personal privacy interests of Plaintiff and members of the putative Classes, it also intentionally and repeatedly violated the TCPA.

### FACTS SPECIFIC TO PLAINTIFF TRICIA CAMPO

16.     Plaintiff Campo is the subscriber to and customary user of the personal cellular telephone number ending in 1788.

17.     Plaintiff Campo registered her cellphone number on the National DNC Registry on or about March 28, 2008.

18.     On July 6, 2020, at 11:01 a.m., Plaintiff received a text message on her cellphone from Defendant using SMS short code 945-52. The July 6, 2020 text message read: "THP SALE for July 4th! $100 OFF + 2 FREE MONTH +FREE ROOF COVERAGE ON ALL HOME WARRANTY PLANS. Call 844-537-6476. Reply STOP to end or Help for Help."

19.     After the receipt of the July 6th text message, Plaintiff responded with "STOP". Plaintiff received an automated confirmation text message from 945-52 that read: "THP: You have successfully opted out. You will not receive messages from Total Home Protection. THP HELP for Help."

20.     Later that same day, on July 6, 2020, at 4:30 p.m., and ignoring the fact Plaintiff had already revoked her consent and received confirmation of the revocation, Plaintiff received another unsolicited text message on her cellphone from Defendant using SMS short code 945-52. This text message, received after the opt-out confirmation, read: "THP SALE for July 4th! $100 OFF + 2 FREE MONTH + FREE ROOF COVERAGE ON ALL HOME WARRANTY PLANS. Call 844-537-6476. Reply STOP to end of Help for Help." This is the exact same message that was received 4 hours prior.

21.     On July 7, 2020, Defendant sent Plaintiff two additional unsolicited text messages from the short code 945-52. The first was sent at 1:04 p.m. and solicited Plaintiff to purchase a home warranty plan. The second text was sent at 6:01 p.m., which read: "THP July 4th PROMO! $100 OFF + 2 FREE MONTH + FREE ROOF COVERAGE ON ALL HOME WARRANTY PLANS. Call 844-537-6476. Reply STOP to end or Help for Help."

22.     Between July 8, 2020 and July 10, 2020, Defendant sent Plaintiff an additional six (6) unsolicited text messages from the short code 945-52. Each of the text messages continued to solicit Plaintiff to purchase Defendant's home warranty plans.

23.     On July 13, 2020, at 11:01 a.m., Plaintiff received yet another unsolicited text message from Defendant's short code 945-52. The unsolicited text message read: "$100 OFF Home Warranty plans + 2 months free. THP has got you covered! Call 844-537-6476. All Annual Plans get FREE Roof Coverage. STOP to end, HELP for Help".

24.     Plaintiff responded "Stop" to the July 13th text message. Like the prior STOP request, Defendant's system automatically responded: "THP: You have successfully opted out. You will not receive messages from Total Home Protection. THP HELP for Help".

25.     Despite confirming Plaintiff's opt-out request, Defendant sent another text message later on July 13, 2020, at 4:48 p.m. The text message read: "THP has got you covered! $100 OFF Home Warranty plans + 2 months free. Call 844-537-6476. ALL Annual Plans get FREE Roof Coverage. STOP to end. HELP for Help".

26.     On July 14th, 2020, Plaintiff received two additional unsolicited text messages from Defendant.

27.     Screenshots of the text messages are reproduced below:



945-52 >

**Text Message**
Mon, Jul 5, 11:01 AM

THP SALE for July 4th! $100 OFF + 2 FREE MONTH + FREE ROOF COVERAGE ON ALL HOME WARRANTY PLANS. Call 844-537-6476. Reply STOP to end or Help for Help.

Mon, Jul 5, 12:15 PM



THP: You have successfully opted out.
You will not receive messages from Total Home Protection.
THP HELP for Help

Mon, Jul 6, 4:30 PM

THP SALE for July 4th! $100 OFF + 2 FREE MONTH + FREE ROOF COVERAGE ON ALL HOME WARRANTY PLANS. Call 844-537-6476. Reply STOP to end or Help for Help.

Tue, Jul 7, 1:04 PM

THP July 4th PROMO! $100 OFF + 2 FREE MONTH + FREE ROOF





Tue, Jul 7, 5:01 PM

THP July 4th PROMO! $100 OFF + 2 FREE MONTH + FREE ROOF COVERAGE ON ALL HOME WARRANTY PLANS. Call 844-537-6476. Reply STOP to end or Help for Help.

Wed, Jul 8, 11:01 AM

Extended July 4th Sale! $100 OFF + 2 FREE MONTH + FREE ROOF COVERAGE on all Home Warranty Plans. Call 844-537-6476. Reply STOP to end or Help for Help.

Wed, Jul 8, 4:32 PM

$100 OFF + 2 FREE MONTH + FREE ROOF COVERAGE on all Home Warranty Plans. Extended July 4th Sale! Call 844-537-6476. Reply STOP to end or Help for Help.

Thu, Jul 9, 10:02 AM

Continuing our July 4th Sale! $100 OFF + 2 FREE MONTH + FREE ROOF COVERAGE on all Home





Wed, Jul 8, 4:46 PM

$100 OFF + 2 FREE MONTH + FREE ROOF COVERAGE on all Home Warranty Plans. Extended July 4th Sale! Call 844-537-6476. Reply STOP to end or Help for Help.

Thu, Jul 9, 11:22 AM

Continuing our July 4th Sale! $100 OFF + 2 FREE MONTH + FREE ROOF COVERAGE on all Home Warranty Plans. Call 844-537-6476. Reply STOP to end or Help for Help.

Thu, Jul 9, 4:45 PM

$100 OFF + 2 FREE MONTH + FREE ROOF COVERAGE on all Home Warranty Plans. Continuing our July 4th Sale! Call 844-537-6476. Reply STOP to end or Help for Help.

Fri, Jul 10, 9:01 AM

Last Day of our July 4th Sale! $100 OFF + 2 FREE MONTH + FREE ROOF COVERAGE on all Home Warranty Plans. Call 844-537-6476. Reply STOP to end or Help for Help.





945-52

Fri, Jul 10, 11:01 AM

Last Day of our July 4th Sale! $100 OFF + 2 FREE MONTH + FREE ROOF COVERAGE on all Home Warranty Plans. Call 844-537-6476. Reply STOP to end or Help for Help.

Fri, Jul 10, 4:45 PM

Don't miss July 4th Sale! $100 OFF + 2 FREE MONTH + FREE ROOF COVERAGE on all Home Warranty Plans. Call 844-537-6476. Reply STOP to end or Help for Help.

Mon, Jul 13, 11:01 AM

$100 OFF Home Warranty plans + 2 months free. THP has got you covered! Call 844-537-6476. ALL Annual Plans get FREE Roof Coverage. STOP to end. HELP for Help.



THP: You have successfully opted out.
You will not receive messages from Total Home Protection.



Case 1:20-cv-00925-AJT-IDD   Document 1   Filed 08/14/20   Page 11 of 22 PageID# 11



945-52 >

STOP

THP: You have successfully opted out.
You will not receive messages from Total Home Protection.
THP HELP for Help

Mon, Jul 13, 4:48 PM

THP has got you covered! $100 OFF Home Warranty plans + 2 months free. Call 844-537-6476. ALL Annual Plans get FREE Roof Coverage. STOP to end , HELP for Help

Tue, Jul 14, 11:01 AM

Cover A/C, Plumbing, appliances & more! $100 OFF Home Warranty plans + 2 months free & free roof coverage. Call 844-537-6476. STOP to end, HELP for Help

Tue, Jul 14, 4:45 PM

$100 OFF Home Warranty plans + 2 months free & free roof coverage. Cover A/C, Plumbing, appliances & more! Call 844-537-6476. STOP to end, HELP for Help



11

28.     By sending unauthorized telemarketing text message calls as alleged herein, especially after consumers like Plaintiff request that they "STOP," THP has caused consumers actual harm in the form of annoyance, nuisance, and invasions of their statutory and common law rights to privacy.

29.     The text messages also interrupted, disturbed and interfered with Plaintiff's use and enjoyment of her phone, in addition to the wear and tear on the phone's hardware (including the phone's battery) and the consumption of memory on Plaintiff's phone.

30.     In the present case, a consumer could be subjected to many unsolicited text messages, and continuous, repeated invasions of privacy, as THP simply ignores opt-out requests that it receives and continues to send messages after explicit requests that they "STOP."

31.     Plaintiff and the DNC Registry Class members specifically listed their names on the DNC Registry to avoid these types of repeated harassing telemarketing messages.

32.     To redress these injuries, Plaintiff, on behalf of herself and two Classes of similarly situated individuals defined below, brings this suit under the TCPA, 47 U.S.C. § 227, *et seq.*, which prohibits unsolicited voice and text calls to cellular telephones.

33.     On behalf of the Classes, Plaintiff seeks an injunction requiring Defendant to cease all unauthorized text-messaging activities and an award of statutory damages to the class members, together with costs, pre- and post-judgment interest, and reasonable attorneys' fees.

## CLASS ALLEGATIONS

34.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of herself and all others similarly situated and seeks certification of the following two Classes:

**Stop Call Class**: All persons in the United States from four years prior to the filing of the initial complaint in this action to the present who: (1) having never executed a home service contract with Defendant; (2) Defendant, or a third person

acting on behalf of Defendant, sent messages from Defendant's short code; (3) to the person's cellular telephone number; (4) for the same reason Defendant caused text messages to be sent to Plaintiff Campo; (5) after the person replied "STOP" or with a substantially similar command.

**DNC Registry Class**: All persons in the United States from four years prior to the filing of the initial complaint in this action to the present who: (1) having never executed a home service contract with Defendant; (2) Defendant, or a third person acting on behalf of Defendant, sent at least two text messages within any 12-month period after the person replied "STOP" or with a substantially similar command; (3) where the person's telephone number had been listed on the National Do Not Call Registry for at least thirty days; (4) for the same purpose as text messages were sent to Campo; (5) for whom Defendant claims it obtained prior express consent in the same manner as Defendant claims it supposedly obtained prior express consent to call Campo.

35.     The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, its subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest, and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) the legal representatives, successors, and assignees of any such excluded persons; (5) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; and (6) Plaintiff's counsel and Defendant's counsel.

36.     Plaintiff anticipates the need to amend the class definitions following appropriate discovery regarding the scope of the Classes.

37.     **Numerosity**: The exact number of members in each of the Classes is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, Defendant sent automated text messages to thousands of consumers who fall into the definition of each Class. Members of the Classes can be identified through reference to Defendant's records.

13

38.     **Commonality and Predominance:** There are several questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

(a)     Whether Defendant's conduct violated the TCPA;

(b)     Whether Defendant systematically failed to honor STOP or similar requests and whether STOP requests sufficiently revoke consent;

(c)     Whether Defendant utilized an automatic telephone dialing system to send text messages to members of the Stop Class;

(d)     Whether, for the members of the DNC Registry Class, Defendant systemically sent multiple text messages during any 12-month period to cellphone numbers listed on the National Do Not Call registry; and

(e)     Whether members of the Classes are entitled to treble damages based on the willfulness of Defendant's conduct.

39.     **Typicality:** Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff and the members of the Classes sustained damages arising out of Defendant's uniform wrongful conduct.

40.     **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions. Neither Plaintiff nor her counsel has interests adverse, antagonistic to, or in conflict with those of the Classes, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting her action on behalf of the members of the Classes and have the financial resources to do so.

14

41.     Conduct Similar Towards All Class Members: This case is also appropriate for class certification because Defendant has acted or refused to act on grounds generally applicable to the Classes as respective wholes, thereby requiring the Court's imposition of uniform relief to ensure comparable standards of conduct toward the members of each Class and making final class-wide injunctive relief appropriate.

42.     Superiority & Manageability: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all parties is impracticable, and the damages suffered by the individual members of the Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. It would be much more difficult for the individual Class members to obtain effective relief from Defendant's misconduct.

43.     By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured.

### FIRST CAUSE OF ACTION
### Violation of the TCPA, 47 U.S.C. § 227, *et seq.*
### (On behalf of Plaintiff and the Stop Call Class)

44.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

45.     Defendant THP and/or its agents transmitted unsolicited text message calls to cellular telephone numbers belonging to Plaintiff and the other members of this Stop Call Class using equipment that, upon information and belief, had the capacity to store or produce telephone

numbers to be called using a random or sequential number generator and/or receive and store lists of phone numbers, and to dial such numbers, *en masse*, without human intervention.

46.   The telephone dialing equipment utilized by Defendant and/or its agent, which is substantially similar to a predictive dialer, stored and dialed numbers from a list, or dialed numbers from a database of telephone numbers, in an automatic and systematic manner. A short code was used to transmit the messages.

47.   These text messages were stored and sent *en masse* and without the consent of the Plaintiff and other members of the Stop Call Class to receive such text message marketing spam.

48.   Plaintiff never purchased a home service contract, home warranty, or any other product from Defendant.

49.   Any prior express consent Plaintiff or any other class member may have provided was expressly revoked by Plaintiff and the Stop Call Class members when they responded STOP. By responding with the common SMS codes to opt-out of further communications, such as "STOP," "REMOVE," "OPT OUT," "END," "CANCEL," etc., each class member communicated his or her unambiguous intent to revoke any such consent.

50.   Prior express consent under the TCPA may be revoked.

51.   Plaintiff and the Stop Call Class members expressly requested that Defendant THP no longer send text messages to them, after which Defendant failed to honor the requests and failed to place Plaintiff and members of the Class on Defendant's internal do-not-call list.

52.   The text messages to Plaintiff and the Stop Call Class were made after any consent had been expressly revoked by responding with an opt-out request, such as "STOP."

53.   A STOP message is a clear revocation of any prior consent that may have been provided by any class member. No prior express consent allowed Defendant to continue text

messaging after the consumers said STOP. In fact, Defendant's text messages expressly informed consumers that they could end the transmission of such messages by responding "STOP."

54.    Indeed, Defendant acknowledged the STOP request and indicated no further messages would be sent. Despite this, Defendant continued to send text messages.

55.    Based on such conduct, Defendant has violated 47 U.S.C. § 227(b)(1)(A)(iii).

56.    As a result of Defendant's unlawful conduct, Plaintiff and the members of the Stop Call Class are each entitled to, under Section 227(b)(3)(B), a minimum of $500.00 in damages for each violation of the TCPA.

57.    In the event that the Court determines that Defendant's conduct was willful and knowing, it may, under 47 U.S.C. § 227(b)(3)(C), treble the amount of statutory damages recoverable by Plaintiff and the other members of the Stop Call Class.

58.    Plaintiff and the Stop Call Class members are also entitled to injunctive relief and corresponding declaratory relief to ensure that the calls stop.

### SECOND CAUSE OF ACTION
### Violation of the TCPA, 47 U.S.C. § 227, *et seq.*
### (On behalf of Plaintiff and the DNC Registry Class)

59.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

60.    47 U.S.C. § 227(c) provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring a private action based on a violation of said regulations, which were promulgated to protect telephone subscribers' privacy and their right to avoid receiving telephone solicitation to which they object.

61.     The TCPA's implementing regulation, 47 C.F.R. § 64.1200(c), provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government."

62.     47 C.F.R. § 64.1200(e), provides that § 64.1200(c) and (d) "are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991.*" The Report and Order, in turn, provides as follows:

> The Commission's rules provide that companies making telephone solicitations to residential telephone subscribers must comply with time of day restrictions and must institute procedures for maintaining do-not-call lists. For the reasons described above, we conclude that these rules apply to calls made to wireless telephone numbers. We believe that wireless subscribers should be afforded the same protections as wireline subscribers.[2]

63.     47 C.F.R. § 64.1200(d) further provides that "[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

> (1) Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

> (2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

_____

[2] 68 Fed. Reg. 44143, 44166 (July 25, 2003).

(3) Recording; disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request . . . .

(4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long-distance transmission charges.

(5) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

(6) Maintenance of do-not-call lists. A person or entity making calls for telemarketing purposes must maintain a record of a consumer's not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made.

64.    Defendant violated 47 C.F.R. § 64.1200(d) by failing to maintain a written policy for maintaining a do not call list, by failing to train its personnel involved in telemarketing regarding the existence and use of any such policy or do not call list, by failing to accurately record do not call requests internally, and by failing to honor do not call requests.

65.    Here, Defendant sent Plaintiff at least thirteen (13) unsolicited text messages after she submitted a valid "STOP" request. Worse yet, Defendant's own system recognized and confirmed at least two of the "STOP" requests.

66.    After confirming Plaintiff's and the DNC Registry Class members' opt-outs, Defendant continued to send text messages to solicit them to purchase its home warranties.

67.    Defendant made multiple unsolicited calls during a 12-month period to Plaintiff and the members of the DNC Registry class despite the fact that Plaintiff and the DNC Registry class members had had their phone numbers listed on the DNC Registry for at least thirty (30) days.

68.    As a result of Defendant's unlawful conduct, Plaintiff and the members of the Stop Call Class are each entitled to, under 47 U.S.C. § 227(c), are each entitled, *inter alia*, to receive up to $500 in damages for such violations of 47 C.F.R. § 64.1200.

69.    To the extent Defendant's misconduct is determined to be willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(c)(5), treble the amount of statutory damages recoverable by the members of the DNC Registry Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Tricia Campo, on behalf of herself and the Classes, prays for the following relief:

A.    An order certifying the Classes as defined above, appointing Plaintiff Campo as the representative of the Classes and appointing her counsel as Class Counsel;

B.    An award of actual monetary loss from such violations or statutory damages in the amount of five hundred dollars ($500.00) for each violation, whichever is greater, all to be paid into a common fund for the benefit of the Plaintiff and the Class Members;

C.    An order declaring that Defendant's text messages, as set out above, violate the TCPA;

D.     A declaratory judgment that Defendant's telephone texting equipment constitutes an ATDS under the TCPA;

E.     A declaratory judgment that Defendant's failure to STOP texting persons whose phone numbers are on the National Do Not Call registry more than thirty (30) days after the person submitted a STOP request violates the TCPA;

F.     An injunction requiring Defendant to honor STOP requests and similar requests and otherwise protecting the interests of the Class;

G.     An award of pre- and post-judgment interest;

H.     An award of reasonable attorneys' fees and costs to be paid out of the common fund prayed for above; and

I.     Such other and further relief that the Court deems reasonable and just.

### JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: August 14, 2020                    TRICIA CAMPO, individually and on behalf of all others similarly situated,

By: /s/
        One of Plaintiff's Attorneys

Francis J. Driscoll, Jr.
(frank@driscolllawoffice.com)
4669 South Blvd., Suite 107
Virginia Beach, VA 23452
Telephone: 757-321-0054
Facsimile: 757-321-4020

Patrick H. Peluso
ppeluso@woodrowpeluso.com
Woodrow & Peluso, LLC
3900 East Mexico Ave., Suite 300
Denver, Colorado 80210

Telephone: (720) 213-0675
Facsimile: (303) 927-0809

Attorneys for Plaintiff and the Class

# Civil Case Information Statement

## Case Details: MIDDLESEX | Civil Part Docket# L-006493-20

Case Caption: THS GROUP LLC   VS COVALENT MARKETING L LC

Case Initiation Date: 09/10/2020

Attorney Name: JOSHUA LOUIS THOMAS

Firm Name: JOSHUA L THOMAS & ASSOCIATES

Address: 225 WILMINGTON-WEST CHESTER PIKE STE 200

CHADDS FORD PA 19317

Phone: 4842336500

Name of Party: PLAINTIFF : THS Group LLC

Name of Defendant's Primary Insurance Company (if known): None

Case Type: CONTRACT/COMMERCIAL TRANSACTION

Document Type: Complaint with Jury Demand

Jury Demand: YES - 12 JURORS

Is this a professional malpractice case?  NO

Related cases pending: YES

If yes, list docket numbers: USDC for the Eastern State of Virginia 20-925

Do you anticipate adding any parties (arising out of same transaction or occurrence)? NO

Are sexual abuse claims alleged by: THS Group LLC? NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

Do parties have a current, past, or recurrent relationship? NO

If yes, is that relationship:

Does the statute governing this case provide for payment of fees by the losing party? NO

Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:


Do you or your client need any disability accommodations? NO
If yes, please identify the requested accommodation:


Will an interpreter be needed? NO
If yes, for what language:


Please check off each applicable category: Putative Class Action? NO  Title 59? NO  Consumer Fraud? NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

09/10/2020
Dated

/s/ JOSHUA LOUIS THOMAS
Signed